**CIUDADANOS UNIDOS DE SAN JUAN et al., Plaintiffs-Appellants,**

v.

**HIDALGO COUNTY GRAND JURY COMMISSIONERS et al., Defendants-Appellees.**

**Robert CABALLERO et al., Plaintiffs-Appellants,**

v.

**Dellis PRATER et al., Defendants-Appellees.**

Nos. 77–3321, 78–1394.

United States Court of Appeals, Fifth Circuit.

July 31, 1980.

James C. Harrington, San Juan, Tex., Bruce J. Ennis, Joel M. Gora, American Civil Liberties Union, New York City, for plaintiffs-appellants.

Nancy M. Simonson, Ed Idar, Jr., Asst. Attys. Gen., Austin, Tex., for defendants-appellees.

Before GOLDBERG, FAY and ANDERSON, Circuit Judges.

GOLDBERG, Circuit Judge:

Almost 800 years ago, the Magna Charta proclaimed, "No free man shall be . . . imprisoned . . . or in any way destroyed, except by the lawful judgment of his peers or [and] by the law of the land." [1] From this seed planted in the early spring of English legal culture has grown our "very idea of a jury . . . a body of men composed of the peers or equals of the persons whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status as that which he holds." *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). And in its transplanted soil, this growth has flourished; our courts have recognized its crucial importance to our system of justice, beyond the rights of any particular criminal defendant: "For ra-

---

**1.** Chap. 39, *quoted in Labat v. Bennett*, 365 F.2d 698, 711 (5th Cir. 1966) (en banc), *cert. denied*, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967).

cial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it, but is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940). *See generally Labat, supra,* 365 F.2d at 711.

Almost three years ago, the Supreme Court applied these principles to reverse the conviction of a criminal defendant in Hidalgo County, Texas, on the ground that Mexican-Americans had been unconstitutionally excluded from the grand jury that indicted him. *See Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The cases before us require that we again trek to Hidalgo County—with a stop, as well, in neighboring Willacy County—in vindication of our "very idea of a jury." Appellants in the cases before us filed civil actions seeking to establish that the grand juries convened in those counties were composed in contravention of the Constitution's requirements because four identifiable groups in the community—Mexican-Americans, women, young people and poor people—had been excluded from consideration for service. The district court dismissed their complaints on the ground that they presented no justiciable controversy. From these dismissals, appellants in both cases seek our review. Because we find the cases justiciable, we reverse.

### I.

A. The courts have on numerous previous occasions described and evaluated the operation of the Texas system of grand juror selection. *See, e. g., Castaneda v.*

*Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); *Akins v. Texas,* 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); *Hill v. Texas,* 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); *Brooks v. Beto,* 366 F.2d 1 (5th Cir. 1966), *cert. denied,* 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967). Because a major issue in the cases before us is the amenability of the Texas system to injunctive relief and because the system was modified in some respects in 1979, we again must look closely at how it functions.[2] Prior to September 1, 1979, and at the time this action was filed, Texas employed exclusively the "key man" method of grand juror selection, "which relies on jury commissioners to select prospective grand jurors from the community at large." *Castaneda, supra,* 97 S.Ct. at 1275 (footnote omitted). *See* Tex.Crim.Proc.Code Ann. Art. 19 (Vernon 1977). In 1979, however, Texas amended its selection laws to make the use of this method optional with the state district judge. *See* Tex.Crim.Proc.Code Ann. Art. 19.01(b) (Vernon Supp.1980).[3] In lieu of use of the key man system, the state district judge may use the same random selection system used for selection of jurors in civil cases in Texas. *See* note·3 *supra.* Since the challenges here are directed solely to alleged abuses occurring in the use of the key man system in the Texas counties of Hidalgo and Willacy, we focus on the manner in which that system operates.

The state district judge initiates the process by appointing three to five persons to

2. The facial constitutionality of the Texas statutes has recently been reaffirmed, *see Castaneda, supra,* 97 S.Ct. at 1281, although the Court noted that "the system is susceptible to abuse as applied." *Id.* Both sets of appellants here limit their attacks on the statutes to the constitutionality of their application.

3. This article provides:

In lieu of the selection of prospective jurors by means of a jury commission, the district judge may direct that 20 to 50 prospective grand jurors be selected and summoned, with return on summons, in the same manner as

for the selection and summons of panels for the trial of civil cases in the district courts. The judge shall try the qualifications for and excuses from service as a grand juror and impanel the completed grand jury in the same manner as provided for grand jurors selected by a jury commission.

The procedure for selection of jurors in civil cases is set out in Tex.Rev.Civ.Stat.Ann. Arts. 2094–2116d (Vernon 1964 & Supp.1980).

The effect on this action of this and other amendments, *see* note 5 *infra,* are discussed in Part II(B) *infra.*

serve as grand jury commissioners. *See* Tex.Crim.Proc.Code Ann. Art. 19.01 (Vernon 1977).[4] The commissioners in turn choose "not less than 15 nor more than 20 persons from the citizens of different portions of the county to be summoned as grand jurors." Tex.Crim.Proc.Code Ann. Art. 19.06 (Vernon 1977).[5] The statutes nowhere specify the manner in which the jury commissioners are to select the names of potential grand jurors to be placed on the grand jury "list,"[6] nor are the jury commissioners required to use any particular source for names to be placed on their list.[7] The mode of selection of potential grand jurors is thus left entirely to the discretion of the jury commissioners.

For a description of the remainder of the relevant selection procedures, we quote from *Castaneda, supra,* 97 S.Ct. at 1275:

4. This article provides

The district judge, at or during any term of court, shall appoint not less than three, nor more than five persons to perform the duties of jury commissioners, and shall cause the sheriff to notify them of their appointment, and when and where they are to appear. The district judge shall, in the order appointing such commissioners, designate whether such commissioners shall serve during the term at which selected or for the next succeeding term. Such commissioners shall receive as compensation for each day or part thereof they may serve the sum of Ten Dollars, and they shall possess the following qualifications:

1. Be intelligent citizens of the county and able to read and write the English language;
2. Be qualified jurors in the county;
3. Have no suit in said court which requires intervention of a jury;
4. Be residents of different portions of the county; and
5. The same person shall not act as jury commissioner more than once in the same year.

The 1979 amendments recodified this section as Article 19.01(a). *See* Tex.Crim.Proc.Code Ann. Art. 19.01(a) (Vernon Supp.1980).

5. A 1979 amendment to this section added the requirement that "[t]he commissioners shall, to the extent possible, select grand jurors who [*sic*] the commissioners determine represent a broad cross-section of the population of the county, considering the factors of race, sex, and age."

As amended, the section in its entirety provides:

When at least 12 of the persons on the list appear in court pursuant to summons, the district judge proceeds to "test their qualifications." Art. 19.21. The qualifications themselves are set out in Art. 19.08: a grand juror must be a citizen of Texas and of the county, be a qualified voter in the county, be "of sound mind and good moral character," be literate, have no prior felony conviction, and be under no pending indictment "or other legal accusation for theft or of any felony." Interrogation under oath is the method specified for testing the prospective juror's qualifications. Art. 19.22. The precise questions to be asked are set out in Art. 19.23, which, for the most part, tracks the language of Art. 19.08. After the court finds 12 jurors who meet the statutory qualifications, they are impaneled as the grand jury. Art. 19.26.[8]

The jury commissioners shall select not less than 15 nor more than 20 persons from the citizens of the county to be summoned as grand jurors for the next term of court, or the term of court for which said commissioners were selected to serve, as directed in the order of the court selecting the commissioners. The commissioners shall, to the extent possible, select grand jurors who the commissioners determine represent a broad cross-section of the population of the county, considering the factors of race, sex and age. Tex.Crim.Proc.Code Ann. Art. 19.06 (Vernon Supp.1980).

6. The fifteen to twenty persons chosen by the jury commissioners as potential grand jurors shall be referred to in this opinion as the jury "list" to distinguish them from the twelve actually chosen from their number to serve on the "panel."

7. Tex.Crim.Proc.Code Ann. Art. 19.04 (Vernon 1977) provides that, upon the jury commissioners, retirement to choose the list of potential grand jurors, the clerk of the court "shall furnish them . . . the last assessment roll of the county." It does not require, however, that all persons chosen must be from that list.

8. It is not clear from the statutes whether the jury commissioners themselves are required or permitted to pass on the ability of the persons on the list to meet the statutory qualifications. In *Castaneda*, the Court interpreted the statute to permit the testing of qualifications to be delayed until the persons on the list appeared

B.  We next examine the allegations of the complaints in the two cases.  In *Ciudadanos de San Juan v. Hidalgo County Grand Jury Commissioners* (the Hidalgo County case), No. 77–3321, the appellants, plaintiffs below,[9] brought suit individually and as class representatives to obtain monetary,[10] injunctive and declaratory relief to redress the systematic exclusion or underrepresentation of four classes of qualified individuals from Hidalgo County grand juries: Mexican-Americans (or those bearing Spanish-surnames); women; young people (those between the ages of 18 and 28); and poor people (those having incomes below the government designated poverty level).[11] Appellants allege that a pattern and practice of systematic exclusion or underrepresentation of the four named groups is established by statistics showing the actual operation of the grand juror selection process over the past ten years and that this pattern and practice will continue.  They allege further that this systematic exclusion or underrepresentation directly harms appellants and the classes they represent by denying them equal consideration "for grand jury service solely because of their sex, age, income, or national origin," and conclude that this injury amounts to a denial of due process and equal protection of the laws under the fourteenth amendment to the United States Constitution.  Named as parties defendant are the jury commissioners of Hidalgo County, in their individual and official capacities, and the judge of the 93rd Judicial District of Texas in his official capacity.[12]  Appellants also seek re-

---

in the district court. *See* 97 S.Ct. at 1276 n. 8. Tex.Crim.Proc.Code Ann. Art. 19.03 (Vernon 1977), however, requires the jury commissioners to swear to an oath, stating, *inter alia*, "that you will not knowingly elect any man as a juryman whom you believe to be unfit and not qualified."  This court has read this oath to require the jury commissioners to evaluate an individual's ability to meet the statutory qualifications before his name is placed on the grand jury list.  *See Brooks v. Beto, supra*, 366 F.2d at 4–5.  While this matter may be important to the proof to be presented at trial, *see Castaneda, supra*, 97 S.Ct. at 1276 n. 8, and should be considered in the formulation of a remedy should the claims of discrimination be proven, it is not relevant to the question at hand; *i. e.*, whether the complaints state justiciable causes of action.

9. They are described in the complaint as follows:

> CIUDADANOS UNIDOS DE SAN JUAN and CIUDADANOS UNIDOS DE DONNA are community organizations dedicated to developing the political rights and responsibilities of San Juan and Donna residents respectively, including more effective use and assertion of their members' voting rights.  Members of both community organizations are almost entirely Mexican-American, many of whom are poor persons, women, and young people.  ARTURO GUAJARDO, JUAN MALDONADO, PABLO MARTINEZ, JESUS RAMIREZ, JESUS JOEL SOLIS, LALO ARCAUTE,  ROBERTO F. LOREDO, CONRADA ARCAUTE, APOLONIA S. MENDOZA, ANTONIO M. GARCIA, AND JUANA VALDEZ COX are citizens of Hidalgo County.

They allege that, although all individual appellants were qualified for grand jury service, only Jesus Ramirez has ever been called.

10. Appellants have abandoned their request for monetary damages in this appeal.  This claim was premised on 42 U.S.C. § 1985.

11. Jurisdiction in this suit was premised on 28 U.S.C. §§ 1343, 1331, 1332, 2201, and 2202.  The claims before us are founded upon 42 U.S.C. §§ 1981 and 1983.

12. It is not clear from the complaint in this case whether appellants intended to challenge the operation of the selection process in Hidalgo County as a whole or only in the 93rd Judicial District of Hidalgo County.  While the complaint names the Jury Commissioners of Hidalgo County as defendants, it names the judge of only the 93rd Judicial District.  There is some indication in the record of this case that appellants considered the judge of the 93rd Judicial District to be the official responsible for the selection of jury commissioners for the whole county.  Appellees indicated in affidavits submitted to the court below, however, that the judges of the three other judicial districts in Hidalgo County—the 92nd, the 139th, and the 206th—are responsible for the naming of jury commissioners to select other groups of potential grand jurors.  For purposes of this appeal, we read the complaint as claiming discrimination in only the 93rd Judicial District.  If appellants intended to challenge the operation of the system in the other judicial districts as well, they should be permitted on remand, in light of the information regarding the selection process submitted by appellees, to amend their complaint to include the judges of the other districts.  This amendment, if it is made on this basis, will affect none of the questions decided on this appeal.

lief against the successors in office of all defendants.

The complaint in *Caballero v. Prater* (the Willacy County case), No. 78–1394, differs in only a few noteworthy respects from that in the Hidalgo County case. While the named plaintiffs [13] and the alleged statistical disparities are, of course, different, this complaint alleges a similar continuing, ten-year pattern of systematic exclusion or underrepresentation of the same four classes of individuals from consideration for grand jury service. For present purposes, the most significant difference between the two complaints is that, in this case, appellants did not name the state district judge as a defendant; rather they sued only the jury commissioners of Willacy County in their individual and official capacities. [14] The relief sought is essentially similar to that requested in the Hidalgo County case, although there is here no request for monetary damages. [15] Appellants in this case also sought relief against appellees' successors.

Because of the close similarities between the complaints, they may, for most purposes, be treated together in our consideration of these cases. Indeed, the district court dismissed the Willacy County case *sua sponte* on the basis of its opinion in the Hidalgo County case.

C. The district court did not find that the facts alleged, if proven, would be inadequate to establish a *prima facie* case of discriminatory exclusion from grand jury service in Hidalgo and Willacy Counties; rather, it held that for a number of reasons the cases were not appropriate for resolution in the federal courts. The district court indicated that, in its opinion, "the most important aspect" of these cases was that, in order for a case to be justiciable, it "must present a set of circumstances which will allow the Court to fashion a remedy, and it is this Court's opinion that this case does not present a controversy which lends itself to 'specific relief through a decree of a conclusive character,'" *quoting Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The district court suggested that plaintiffs faced an initial obstacle by virtue of their lack of standing, because they actually sought relief for present and prospective criminal defendants, not for themselves. More fundamentally, however, the district court declared that it was "unable to formulate and supervise an injunction which would be an effective response to Plaintiff's request that this Court enjoin the Defendant Jury Commissioners and their successors from excluding any cognizable class or group from grand jury service." This holding rested upon the court's belief that the discretion inherent in the Texas grand juror selection process rendered it unamenable to injunctive relief, especially since the statutory scheme had been held facially constitutional. *See* note 2 *supra*. Because it thought any relief it might attempt to institute would too greatly intrude upon the state's management of its affairs, the court also suggested that some form of abstention might be appropriate. [16]

---

13. The plaintiffs were described in the complaint as follows:

Robert Caballero, Rafael Cantu, Yolanda Castaneda, Eloy Castaneda, Angelita Reyna, Sylvia Caballero, Justino Fonseca, Jr., and Abelardo Fonseca are all citizens and residents of Willacy County. Each Plaintiff, except Eloy Castaneda and Rafael Cantu, is under the age of 30. Rafael Cantu is retired and receives Social Security benefits.

They allege that, although all were qualified for grand jury service, only Robert Caballero has ever been called.

14. The jurisdictional bases for this suit are identical to those alleged in the Hidalgo County case. *See* note 11 *supra*. The claim here is stated under 42 U.S.C. § 1983.

15. Thus, in neither of the cases in this appeal do we face the question whether monetary damages are appropriate. *See* note 10 *supra*.

16. The district court also held that the state judge in the Hidalgo County case and the jury commissioners in both cases were immune from a suit for damages. Appellants do not now press any claims for damages, and appellees have no immunity from equitable or declaratory relief. *See, e. g., Slavin v. Curry*, 574 F.2d 1256, 1264, *vacated as moot*, 583 F.2d 779 (5th Cir. 1978); *Person v. Association of Bar*, 554 F.2d 534, 537 (2d Cir. 1977), *cert. denied*,

Appellees have attempted in this court to buttress the district court's conclusions, and they suggest, in addition, that no case or controversy presently exists because, for various reasons, the appellants' claims are either moot or not ripe. After carefully considering all these contentions, we must disagree with the holdings of the district court and the arguments of appellees. We think appellants in both cases have presented a justiciable controversy appropriate for resolution in the federal courts.

## II.

A. Appellees' first argument that no justiciable claims are presented derives primarily from their contention that the complaints on their face fail to show a live controversy between the appellants and appellees. First, appellees suggest appellants are not the proper parties to maintain these suits. Then, relying primarily on the Supreme Court's decisions in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and *Spomer v. Littleton*, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974), appellees argue that appellants' only allegations are of past exposure to illegal conduct in the administration of the grand juror selection scheme and that the complaints provide no basis for inferring that this illegal conduct does now or will hereafter persist. Appellants' subjective fears of continued discrimination, appellees assert, cannot create a live case or controversy. Correlatively, appellees contend that any discrimination practiced in the past was personal to the previous jury commissioners and thus gives rise to no inference that the present commissioners or their successors will continue these practices. We find that these contentions misrepresent the allegations of the complaints, particularly when these allegations are read in light of the Texas statutory scheme. Properly construed, the complaints present a live case or controversy between appellants and appellees within the meaning of Article III of the Constitution.

We turn first to *O'Shea, supra*, the case relied upon by appellees, for a digest of the relevant constitutional requisites for a viable case or controversy. There the Court stated:

Plaintiffs in the federal courts "must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). There must be a "personal stake in the outcome" such as to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Nor is the principle different where statutory issues are raised. Cf. *United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). Abstract injury is not enough. It must be alleged that the plaintiff "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged statute or official conduct. *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). The injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." *Golden v. Zwickler*, 394 U.S. 103, 109–110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969); *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *United Public Workers v. Mitchell*, 330 U.S. 75, 89–91, 67 S.Ct. 556, 564–565, 91 L.Ed. 754 (1947). Moreover, if none of the named plaintiffs

---

434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977). Therefore, no question of official immunity remains in these cases.

In addition, we note that, while both the district court and the parties have treated the dismissals as falling under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, they actual-

ly fall under Fed.R.Civ.P. 12(b)(1) since the court found that it lacked jurisdiction to hear the cases. For purposes of this motion to dismiss, we take the allegations of the complaints as true and construe them favorably to appellants. *See Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 2206–2207, 45 L.Ed.2d 343 (1975).

purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class. *Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–551, 7 L.Ed.2d 512 (1962); *Indiana Employment Division v. Burney*, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973). See 3B J. Moore, Federal Practice, ¶ 23.10–1, n.8 (2d ed. 1971).

*Id.* at 675 (footnotes omitted). From this concatenation of principles, we derive the two basic constitutional requisites that a plaintiff must meet before invoking the jurisdiction of the federal courts: the plaintiff must show that the controversy is a "live" one and that he possesses a legally cognizable interest which gives him a "personal stake" in the outcome.[17]

1. Assuming *arguendo* for the moment that appellants' claims were presented in the context of a live case or controversy, we think it clear that the named appellants, and therefore the classes they claim to represent, *see O'Shea, supra*, 94 S.Ct. at 675, have the kind of legally cognizable interest that gives them a personal stake in the outcome.[18] Our inquiry here is, in essence, whether appellants are proper parties to bring these suits.

The district court concluded that the proper parties to bring these suits were not those who had been discriminatorily excluded from consideration for grand jury service, but were those who had been indicted by unconstitutionally composed grand juries. As a proposition of law, this is simply incorrect. In *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), and *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the Supreme Court expressly held that civil suits like those before us could be maintained by the victims of the state's exclusionary practices. In *Carter*, the Court stated:

> Defendants in criminal proceedings do not have the only cognizable legal interest in nondiscriminatory jury selection. People excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion. Surely there is no jurisdictional or procedural bar to an attack upon systematic jury

---

**17.** These basic constitutional principles cut across the boundaries of many of the subcategories of justiciability doctrine. For example, the Supreme Court has recently written that "mootness has two aspects: 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *U. S. Parole Commission v. Geraghty*, —— U.S. ——, ——, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). *O'Shea* itself has been characterized as involving a blend of standing, ripeness and mootness considerations. *See Lyons v. City of Los Angeles*, 615 F.2d 1243, 1246 n.5 (9th Cir. 1980); 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3529 n.21. (1975). In *O'Shea*, however, the Court did not label the complex questions it faced in terms of these subcategories; instead, it straight forwardly applied the constitutional principles it enunciated. In these cases, we follow the same approach. As one commentator has observed, "There is no reason to demand a final expression in terms of standing, ripeness, mootness, or political question doctrine, if the court is able to conclude that there is no sufficient need for deciding the issues tendered without relying on the frequent question begging terminology of any single concept." *Id.* at 147.

Of course, justiciability doctrine encompasses more than the question whether the court has power under Article III to decide the case. Often, prudential considerations militate against the use of judicial power even when its constitutionality is established. *See, e. g., Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). *See generally* Wright, Miller & Cooper, *supra*, at § 3529. We consider the "prudential" considerations raised in these cases as notes 23 & 49 *infra*.

**18.** It is true, of course, that this "personal stake," which is the heart of the standing doctrine, *see Warth, supra*, 95 S.Ct. at 2205, cannot exist where the controversy between plaintiffs and defendants has expired, *see Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 1215–16, 51 L.Ed.2d 376 (1977), or where the existence of the controversy is purely a matter of speculation and conjecture; *i. e.*, where the controversy is not "ripe." *See, O'Shea, supra*, 94 S.Ct. at 676–77. Our inquiry here is simply whether appellants have a legal right to complain of their exclusion from grand jury service. The existence of a live controversy which allows them to litigate their exclusion is considered below.

discrimination by way of a civil suit such as the one brought here. The federal claim is bottomed on the simple proposition that the State, acting through its agents, has refused to consider the appellants for jury service solely because of their race. Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise. Once the State chooses to provide grand and petit juries, whether or not constitutionally required to do so, it must hew to federal constitutional criteria . . . .

*Id.*, 90 S.Ct. at 523 (footnotes omitted). Further, the Court recently emphasized in a *habeas corpus* action that suits by the classes discriminatorily excluded were the preferred mode of attacking grand jury discrimination. *See Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 3001, 61 L.Ed.2d 739 (1979); *id.* at 3009 (Stewart, J., concurring in the judgment); *id.* at 3014 (Powell, J., concurring in the judgment). Finally, this court has on numerous occasions allowed suits of this nature with classes founded on both race and sex to proceed without objection to nature of the action. *See, e. g., Porter v. Freeman*, 577 F.2d 329 (5th Cir. 1978); *Berry v. Cooper*, 577 F.2d 322 (5th Cir. 1978); *McGhee v. King*, 518 F.2d 791 (5th Cir. 1975); *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975); *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974), *cert. denied*, 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975); *Broadway v. Culpepper*, 439 F.2d 1253 (5th Cir. 1971); *Ford v. White*, 430 F.2d 951 (5th Cir. 1970); *Raiford v. Dillon*, 430 F.2d 949 (5th Cir. 1970); *Preston v. Mandeville*, 428 F.2d 1392 (5th Cir. 1970); *Black v. Curb*, 422 F.2d 656 (5th Cir. 1970); *Salary v. Wilson*, 415 F.2d 467 (5th Cir. 1969); *Pullum v. Greene*, 396 F.2d 251 (5th Cir. 1968); *Billingsley v. Clayton*, 359 F.2d 13 (5th Cir. 1966) (en banc), *cert. denied*, 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74 (1967).

Faced with this jurisprudence, appellees now argue in addition that even if the action can be maintained for discrimination on the basis of sex and national origin, the classes of young people, defined in the complaints as including individuals between the ages of 18 and 28, and of poor people, defined as including individuals with below poverty-level incomes, are not legally cognizable. At the pleading stage of this litigation, we must reject this contention.

In *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), the Court recognized that systematic exclusion of Mexican-Americans from grand jury service violated the Constitution. In so holding, it wrote:

Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a "two-class theory"— that is, based upon differences between "white" and Negro.

*Id.* at 670. *See Castaneda, supra*, 97 S.Ct. at 1280; *White v. Regester*, 412 U.S. 755, 767, 93 S.Ct. 2332, 2340, 37 L.Ed.2d 314 (1973). From *Hernandez*, we conclude that, when a plaintiff alleges that he is a member of a group founded upon an identifiable and distinct characteristic and that members of that group are treated differently solely because they bear that characteristic, and not because the difference in treatment is reasonably related to a legitimate state objective, then the plaintiff is entitled to attempt to prove that there exists such an identifiable and distinct class in the commu-

nity and that it is subject to the discrimination alleged. As this court has written in a similar context, "[t]he equal protection clause prohibits a state from making arbitrary and unreasonable classifications," and an exclusionary classification of potential jurors based on factors which have "no relationship to their competency as jurors" or other legitimate state objectives is unreasonable. *Labat v. Bennett*, 365 F.2d 698, 723 (5th Cir. 1966) (en banc), *cert. denied*, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967).

Our formulation of these principles derives support from the decisions in *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) and in *Labat, supra*, which held that the exclusion of daily wage earners from consideration for jury service was impermissible. In *Thiel, supra*, which was based primarily on the Court's supervisory power over the federal courts, the Court stated:

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84; *Glasser v. United States*, 315 U.S. 60, 85, 62 S.Ct. 457, 471, 86 L.Ed. 680. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is

an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury. * * * This exclusion of all those who earn a daily wage cannot be justified by federal or state law. Certainly nothing in the federal statutes warrants such an exclusion. And the California statutes are equally devoid of justification for the practice. * * * Wage earners, including those who are paid by the day, constitute a very substantial portion of the community, a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of jury panels may have to discriminate against persons of low economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically, and socially privileged. That we refuse to do.

*Id.* at 985–987. *Labat* established that the principle of *Thiel* has constitutional foundations in the due process and equal protection clauses of the fourteenth amendment. *Labat, supra*, 365 F.2d at 722–723.[19]

■ In the cases before us, certain of the appellants contend that they have been discriminated against because of either their age or their economic status. They have alleged that the population between the ages of 18[20] and 28 in both Hidalgo and Willacy Counties is 16 percent of the total population and that 50 percent and 57 percent of the population of Hidalgo and Wil-

---

**19.** *Labat* suggested that perhaps only total exclusion of daily wage earners would offend the Constitution. *Id.* at 721. It is now well-established, however, that "substantial underrepresentation of the [identifiable] group constitutes a constitutional violation as well, if it results from [intentional] discrimination." *Castaneda, supra*, 97 S.Ct. at 1279. This conclusion is only logical. Purposeful underrepresentation is

merely exclusion in another form. The victims of the discriminatory practices are excluded from those positions to which fair representation would entitle them.

**20.** One must be 18 to qualify for grand jury service in Texas. *See* Tex.Crim.Proc.Code Ann. Art. 19.08 (Vernon 1977).

lacy Counties, respectively, have incomes below the government-designated poverty levels. They have alleged further that virtually no members of these groups have been called for grand jury service over the past ten years. Under these allegations, we refuse to hold as a matter of law that these groups are not legally cognizable. Both groups are clearly defined in the complaint and comprise significant proportions of their counties, and the degree of exclusion alleged certainly lends credence to their claim that they have been "identified" in their communities. Under *Hernandez, supra,* the representatives of these groups are entitled to present evidence to the district court to show that the groups, as defined in the complaint, are sufficiently "identifiable." [21] *See id.,* 74 S.Ct. at 670. The burden is theirs. *Id.*[22]

21. For fourteenth amendment purposes, the inquiry into whether a group is "identifiable" is directed toward determining whether the group is viewed by the community as a whole, or at least by the relevant state officials, as a group sufficiently distinct from the remainder of the community to be a credible target for the exercise of community prejudices. Evidence that the community recognizes the distinctness of the group, *see Hernandez, supra,* 74 S.Ct. at 671, or that the group has been subjected to special disadvantages in the community, *see Castaneda, supra,* 97 S.Ct. at 1280, may be used to establish its distinctness.

Further, it is significant that, in both *Thiel* and *Labat,* the defendants admitted that they had singled out daily wage earners for disparate treatment. *See Thiel, supra,* 66 S.Ct. at 986; *Labat, supra,* 365 F.2d at 713–716. This admission of discrimination was apparently enough alone to establish that daily wage earners were a cognizable group since the court inquired into no other indicia of group identification. Similarly, in these cases, appellants have claimed a virtually total exclusion of the young and the poor, as defined in the complaint. Proof of such extensive exclusion of these groups when other economic or age groups are not subjected to the same treatment would certainly be strong evidence that these groups have been "identified" by the relevant state officials. Further, evidence of exclusion of this magnitude may be particularly relevant where the selection procedures are non-neutral with regard to the allegedly excluded group. Because, under the Texas selection system, the jury commissioners may know both the age and economic status of the persons they select since these individuals are "handpicked," *see Brooks, supra,* 366 F.2d at 29 (Wisdom, J., concurring), the selection system must be regarded as non-neutral with regard to the groups of the young and the poor. *Cf. Castaneda, supra,* 91 S.Ct. at 1280 (Texas selection system is non-neutral with regard to Mexican-Americans).

Finally, it has been settled in other areas of equal protection analysis that an individual discriminated against because of his age or economic status suffers a legal injury. *See generally* L. Tribe, American Constitutional Law §§ 16–29, 16–33 to 16–35 (1930). The question we face is whether appellants have established, under the rule laid down by *Hernandez,* an adequate predicate for the litigation of their age- and economic status-based claims. For the reasons set forth, we think they have. Appellants do, however, bear the burden of proving that the definitional bases for the groups alleged in the complaint are sufficient to give content to the otherwise amorphous groups of the young and the poor. That is, appellants must prove that the criteria for group membership that they have alleged adequately differentiate these groups from the remainder of the community or that these criteria adequately define the groups against which the alleged discrimination has been levelled. *See generally* Gewin, An Analysis of Jury Selection Designs, *reprinted as appendix to Foster v. Sparks,* 506 F.2d 805, 823–25 (5th Cir. 1975).

22. Appellees rely on *United States v. Kleifgen,* 557 F.2d 1293 (9th Cir. 1977), for the proposition that the young and the poor are not cognizable groups. *Kleifgen,* however, lends them little aid. First of all, *Kleifgen* did not actually involve a claim of exclusion of the poor. That case involved claims of exclusion of *inter alia,* non-high school graduates and non-working people; the court held that these groups were "by no means synonymous" with the poor. *Id.* at 1296 n.6.

While *Kleifgen* did hold that "the young" was not a cognizable group, that holding is of little persuasive value here. *Hernandez v. Texas, supra,* held that it was a question of fact whether a group allegedly unlawfully excluded constituted a cognizable group within the relevant community. *See id.,* 74 S.Ct. at 670. The fact that the record in one case failed to establish that the young constitute a cognizable group within the community does not mean that, in this case, appellants will also fail to meet their burden.

More fundamentally, *Kleifgen* was a challenge based on the federal jury selection statutes, 28 U.S.C.A. § 1861 *et seq.* (West Supp. 1979). As such, it was one of a series of cases holding that various groupings of young people did not comprise cognizable groups for purposes of claims by litigants that the juries involved were illegally composed under those statutes. *See, e. g., United States v. Potter,* 552

■ This result is no less than commonsensical. Our constitutional rights are personal. An individual citizen should not be, and under the Constitution cannot be, deprived of individual equality under the law solely because he belongs to an identifiable segment of society against which official discrimination has been leveled. An individual's youth or poverty bears no relation to his competency for grand jury service, and an exclusionary classification based on those criteria is unreasonable. If identifiable groups based on these criteria

F.2d 901 (9th Cir. 1977); *United States v. Test,* 550 F.2d 577 (10th Cir. 1976) (en banc); *United States v. Ross,* 468 F.2d 1213 (9th Cir. 1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973). *But see United States v. Butera,* 420 F.2d 564 (1st Cir. 1970) (Coffin, J.) (age group, 21–34, is cognizable). In the cases rejecting the claims of exclusion of the young, the courts attempted to protect the federal statutory "right of all litigants to have grand (and, of course, trial) juries selected from a fair cross section of the local community." *Potter, supra,* 552 F.2d at 901. *See* 28 U.S.C.A. § 1861 (West Supp.1979). The courts have relied heavily on a supposed lack of internal cohesion in the groups of the young, and a corresponding lack of a distinctive viewpoint, to support their holding that these groups were not cognizable; these factors, they hold, establish that these groups add nothing to the "fair cross section" guaranteed the litigant. *See, e. g., Potter, supra,* 552 F.2d at 904–905. But while these factors may be relevant to group identification for purposes of protecting the *parties' rights* under the federal selection statutes, a point upon which we express no opinion, they are not necessary to group identification for purposes of protecting an *individual's right* to equal consideration for jury service under the fourteenth amendment, the right which forms the foundation for this lawsuit. If an individual is denied equal consideration because of his group membership and if the group meets the cognizability requirements of *Hernandez, supra,* then the fourteenth amendment has been violated.

**23.** Assuming that a case or controversy exists, the appellant organizations in the Hidalgo County case, *see* note 9 *supra,* are entitled to bring this action as representatives of their members who, it is alleged, belong to the four named classes. *See, e. g., Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975). Because the claims stated and the relief sought are class-wide, the individual participation of each injured party is not indispensable to the proper resolution of the cases. *See id.* at 2212.

are proven, both common sense and the Constitution indicate that, if they prove they have suffered discrimination, they are entitled to a remedy. We thus conclude that, as members of groups of Mexican-Americans, women, the young between the ages of 18 and 28, and the poor with incomes below the "poverty level," appellants are, at this stage of the litigation, proper parties to bring these actions.[23]

2. Appellees' claims that the complaints fail to allege a live case or controversy are founded upon two unique aspects of the

It is appropriate here to respond to two other arguments raised by appellees as they seek to establish that appellants are not entitled to bring these actions. First, because the Constitution guarantees a right to equal consideration for grand jury service, *see Carter, supra,* 90 S.Ct. at 523, and because appellants have alleged a denial of their right to equal consideration, appellants' cases neither fall, nor bleed, upon the thorns of a "but for" argument raised by appellees. Appellees argue that no one individual has a right actually to *serve* on a particular grand jury, and thus that appellants cannot claim that "but for" appellees' actions they would actually have served. From this premise, appellees argue, relying on *Warth v. Seldin, supra,* 95 S.Ct. at 2208–2209, that appellants are unable to maintain their actions since no relief granted could ever force the appellees to select for jury service any particular one of their number.

Appellees have chosen the wrong "but for." Appellants claim that "but for" appellees' actions they would have received equal consideration for grand jury service. To this consideration they have a right and any relief granted will be directed to its achievement.

Second, relying on *Finch v. Mississippi State Medical Ass'n,* 585 F.2d 765 (5th Cir. 1978), appellees argue that appellants lack any particularized injury that entitles them to maintain their actions. In *Finch,* the court held that a female plaintiff lacked particularized inquiry where she claimed that she, as representative of classes of poor citizens and of women, had been denied equal consideration for appointment to the Mississippi Medical Board. *Id.* at 771. Without questioning the correctness of this holding, we conclude that *Finch* is distinguishable. Whatever rights there may be to be considered for a state medical board, *Carter* and *Turner* establish that one who is denied equal consideration for service on grand juries —and, indeed, on school boards, *see Turner, supra,* 90 S.Ct. at 541—on the basis of his membership in an identifiable group has suffered a legally cognizable injury.

Texas grand juror selection scheme. First, appellees argue that each compilation of the fifteen to twenty member grand juror list is a discrete event. The acts taken by the jury commissioners in choosing any particular grand jury list have no impact on the choice of grand jurors for the next list, for the next set of jury commissioners has full discretion to go about the selection process in its own way.[24] Each set of grand jurors in Texas is thus, as Judge Wisdom has observed, "handpicked." *See Brooks, supra*, 366 F.2d at 29 (concurring opinion). Relying on *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1979), appellees contend that allegations of past discrimination are insufficient to create a live case or controversy and that, since the selection of each list is a distinct act, the complaint affords no basis, other than appellants' subjective fears, for concluding that the discrimination will continue.

In *O'Shea*, the complainants charged a county judge and magistrate in Cairo, Illinois, with discrimination in bondsetting, sentencing, and other official activities, and sought injunctive relief. While some of the complainants claimed to have been injured by these practices in the past, none claimed that, at the time of filing the complaint, he was serving an illegal sentence, on trial or awaiting trial before the defendants. Even though complainants contended that the practices continued, the Court found that, under all the circumstances, the complaint did not present a viable case or controversy under Article III. It held that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, . . . if unaccompanied by any continuing, present adverse effects." 94 S.Ct. at 676. And while it did recognize that, "[o]f course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *id.*, it held that the facts alleged did not support the existence of such a threat with respect to these complainants. Complain-ants did not allege that any state law was unconstitutional on its face or as applied or that any of the complainants had been or would be improperly charged. As the Court summarized the situation,

> Apparently the proposition is that *if* respondents proceed to violate an unchallenged law, and *if* they are charged, held to answer and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed.

*Id.* Thus, the holding in *O'Shea* was not premised on the fact that the allegations were insufficient to establish that the defendants would continue their allegedly unlawful conduct if the opportunity arose, as appellees have argued; rather, it was premised on the fact that, as to the named plaintiffs, the opportunity was not sufficiently likely to arise. For this reason, the threat of injury to the complainants was "simply too remote" to establish a viable case or controversy. *Id.* at 677.

■ *O'Shea* does not control the disposition of these cases. Appellees correctly assert that the allegations of past illegal conduct, which is concededly without continuing impact, do not in themselves establish a live controversy. These allegations are, however, evidence sufficient to give rise to a strong inference that the injury will be repeated in the future. Each compilation of a grand juror list is concededly a discrete act. Nevertheless, the complaints alleged that over ten years these discrete acts have consistently produced grand juror lists upon which the classes to which appellants belong have been substantially underrepresented. With this pattern as their factual predicate, the complaints allege that the selection statutes have been and will continue to be discriminatorily and unconstitutionally applied by the incumbent jury commissioners and their successors.

Under these allegations, the threat of future injury is palpable. Unlike the con-

---

24. The Texas selection system thus differs from the Alabama system considered in *Carter, supra*. In Alabama, the jury commissioners compiled a "master list" of potential jurors that was used for years afterward. *Id.* 90 S.Ct. at 520-22. The past acts of discrimination there thus had effects which continued to the time of the litigation of the case.

tingency-riddled complaint in *O'Shea*, the complaints here claim an injury that turns on a single contingency: that the jury commissioners will act exactly as they have for the past ten years. Unlike *O'Shea*, where the prospect of future injury turned on the plaintiffs' violation of valid laws and their being properly charged under those laws, appellants' injury here depends solely upon the actions of the appellees. Again unlike *O'Shea*, appellants here contend that appellees have applied and will continue to apply the relevant laws in an unconstitutional manner. Further, the very nature of the Texas selection scheme gives substance to appellants' allegations that the injury to them established in the past will continue. By placing an essentially ungoverned discretion in the hands of the jury commissioners when they compile the lists, the scheme creates ample opportunity for discrimination; as the Supreme Court has recently iterated, this scheme is "highly subjective" and "susceptible to abuse as applied." *Castaneda, supra*, 97 S.Ct. at 1281. For all these reasons, appellants' allegations of a continuing controversy meet the concerns of *O'Shea*.

The second aspect of the Texas selection scheme upon which appellees rely to argue that there is no live case or controversy with regard to the jury commissioners is the fact that each grand juror list is compiled by a separate set of jury commissioners. *See* Tex.Crim.Proc.Code Ann. Art. 19.01 (Vernon 1977). Basing their arguments on *Spomer v. Littleton*, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974), appellees contend that any past discrimination was personal to the former commissioners and that, even though appellees were sued in their official capacities, the complaints afford no basis for concluding that the appellee commissioners or their successors will continue these practices. For reasons quite similar to those set out above, this argument, too, must fail.

In *Spomer*, a companion case to *O'Shea*, the complainants sought injunctive relief against the state's attorney in Cairo, one Berbling, for "an alleged practice of willful and malicious racial discrimination." *Spomer, supra*, 94 S.Ct. at 689. After the court of appeals decided the case adversely to Berbling, he was succeeded in office by W. C. Spomer, and Spomer filed a petition for review of the decision in the Supreme Court.[25] In remanding the case to the court of appeals for a determination whether the dispute alleged had expired by virtue of the change of defendants, the Court observed:

> The wrongful conduct charged in the complaint is personal to Berbling, despite the fact that he was also sued in his then capacity as State's Attorney. No charge is made in the complaint that the policy of the office of State's Attorney is to follow the intentional practices alleged, apart from the allegation that Berbling, as the incumbent at the time, was then continuing the practices he had previously followed. . . . Nor have respondents ever attempted to substitute Spomer for Berbling after the Court of Appeals decision, so far as the record shows, or made any record allegations that Spomer intends to continue the asserted practices of Berbling of which they complain. The plain fact is that, on the record before us, respondents have never charged Spomer with anything and do not presently seek to enjoin him from doing anything.

*Id.* at 689 (citation and footnotes omitted). In later cases, the solute concerns of *Spomer* were crystallized into a simple principle: where the plaintiff claims prior patterns of discrimination by a government official, but there has been a change in the occupant of that office, the plaintiff must establish some basis to believe that the successor will continue the practices of his predecessor before the issuance of prospective coercive relief against the successor is warranted. *See Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct.

---

**25.** Spomer was substituted for Berbling in the case pursuant to Supreme Court Rule 48(3), an analog to Fed.R.Civ.P. 25(d). *See Spomer, su-*pra, 94 S.Ct. at 689 n.9. Rule 25(d) is reprinted in note 26 *infra*.

1323, 1334, 39 L.Ed.2d 630 (1974); *Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963, 966–68 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978); *Sarteschi v. Burlein*, 508 F.2d 110, 114 (3d Cir. 1975). In the context of a motion to dismiss, therefore, the burden is on the plaintiff "to allege that the misconduct was the policy of the office or that the successor intended to continue the unlawful practices." 3B Moore's Federal Practice ¶ 25.09[3], at 25–109, 25–110 (2d ed. 1980). Appellants in these cases have satisfied this burden.

■ Appellants have alleged a pattern of discrimination by the predecessors of the appellee jury commissioners, spanning a ten-year period. During this period, the occupants of the office of jury commissioner in both Hidalgo and Willacy Counties have, of necessity, changed several times, since Texas law specifies that jury commissioners shall serve for one term of court and that no person shall act as jury commissioner more than one time in any year. *See* Tex.Crim.Proc.Code Ann. Art. 19.01 (Vernon 1977). Appellants have alleged further that the incumbent jury commissioners will follow the practice of their predecessors, have sought relief against the successors of the incumbents and have moved this court for an order substituting the successors of the jury commissioners named in the complaints. They have thus met their burden of establishing a controversy with the jury commissioners named in the complaint and, indeed, with their successors. They have not only alleged that the dispute will continue with appellees, but also supplied factual allegations from which the continuation of the dispute is a reasonable inference. Appellants must therefore be permitted to attempt to prove their allegations.[26]

■ A closer and slightly different question arises with regard to the judge of the 93rd Judicial District, a defendant in the Hidalgo County case.[27] At the time the complaint in that case was filed, Judge Magus Smith held that office and was sued only in his official capacity. Shortly thereafter, he resigned and was replaced by Judge Joe A. Cisneros. We note that appellants have alleged a continuing pattern of discrimination, sought relief against the successors of all defendants, and argued in the lower court that substitution is proper for all defendants. Further, Judge Cisneros has made no record allegation that he will not continue Judge Smith's practices. Thus, we conclude that, under the principles of *Spomer*, the controversy between appellants and the judge of the 93rd Judicial District also remains a live one. It will be open to Judge Cisneros, as it will be to all

---

**26.** As noted above, appellants have submitted to this court in each case a motion to substitute the successors in office of the appellee jury commissioners, pursuant to Fed.R.Civ.P. 25(d), and a motion for judicial notice of the identity of those successors. Rule 25(d) provides:

(1) When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded. An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution.

(2) When a public officer sues or is sued in his official capacity, he may be described as a party by his official title rather than by name; but the court may require his name to be added.

Because we have determined that the complaints allege a dispute which will continue with appellees' successors, substitution is appropriate. *See Spomer, supra*, 94 S.Ct. at 689 n. 9. These cases fall well within the principle stated in the Advisory Committee Notes to Rule 25(d): "In general, it will apply whenever effective relief would call for corrective behavior by the one then having official status and power, rather than one who has lost that status and power through ceasing to hold office." *See* 3B Moore's Federal Practice ¶ 25.09[3], at 25–403, 25–404 (2d ed. 1980). Nevertheless, since it is possible that the identity of appellees' proper successors may change again before the case comes to trial, we REMAND these motions to the district court.

**27.** See note 12 *supra*.

appellees, to refute these allegations at trial.[28]

In assessing the threat of future injury to appellants, particularly in light of the shuttling in and out of the state officials allegedly responsible for that injury, it is of paramount importance to bear in mind the one constant factor (one is tempted to say "actor") in these cases: the Texas selection system. That system provides only the most rudimentary objective guidelines and virtually no formal procedures to direct the jury commissioners in making their selections for grand jury service.[29] As this court has previously observed, it relies "at no stage on random choice or the laws of chance." *Brooks, supra,* 366 F.2d at 4. Because it is "highly subjective" and "susceptible to abuse as applied," *Castaneda, supra,* 97 S.Ct. at 1281, it invites discrimination of the type of which appellants complain, as is evidenced by the numerous successful challenges to its operation raised in the context of criminal proceedings. *See, e. g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); *Hill v. Texas,* 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); *Muniz v. Beto,* 434 F.2d 697 (5th Cir. 1970); *Brooks v. Beto,* 366 F.2d 1 (5th Cir. 1966), *cert. denied,* 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967). Against this backdrop and in light of the history of discrimination alleged in the complaints, one cannot easily discount appellants' allegations of impending injury. It would be ironic, indeed, if appellees could rely on the discreteness of the choices made and the inherent turnover of the occupants of the crucial positions to establish that no justiciable controversy exists. If these arguments were credited, the operation of the Texas selection system would be effectively insulated from federal equitable relief to protect those in appellants' situation from denial of their constitutional rights. Appellees appear to seek a license in perpetuity to continue their old ways. This they may not have.[30]

**28.** One could conceivably read *Spomer, supra,* more strictly than we have here and conclude that it requires a plaintiff explicitly to contend at some point that the *specific* successor of a named defendant intends to continue the complained of activities. *See id.* at 689 & n. 10. It would, however, disserve the purposes of both the liberalized pleading rules and Fed.R.Civ.P. 25(d) to do so, as this case illustrates. Appellants alleged that the harm is a continuing one and found it necessary to seek relief against all defendants' successors in order to secure effective relief. Further, the facts alleged, as has been demonstrated, give credence to the contention that there is a continuing controversy with all defendants, and the successors of appellees have made no record allegations that they intend to abandon the practices of their predecessors. Under these circumstances, if automatic substitution is to be truly "automatic," the controversy present on the face of the complaint should be honored and no further specific pleadings or "contentions" required. Otherwise, we will have reverted both to an older form of substitution by motion, *see* 3B Moore's Federal Practice ¶ 25.01[1] (2d ed. 1980), and to a more rigid and impractical set of pleading rules. We must remember that we deal here with pleadings which entitle a plaintiff to present his claims in court. They do not guarantee him an ultimate victory on the merits, nor do they condemn a defendant to ultimate defeat and liability upon the basis of unfounded charges. Subject to the limited effects given a "voluntary cessation" of illegal practices, discussed below, appellees' successors may be able to prove either that the systems did not operate in a discriminatory manner or that they have reformed the grand juror systems of Hidalgo and Willacy Counties and therefore that relief against them is inappropriate. We interpret *Spomer* to require no more than is contained in these complaints. And defendants, too, will have their day in court.

**29.** *See* pp. 811–812 *supra.*

**30.** In *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966), the court held, in a case involving a persistent pattern of violations of the fourth amendment rights of black citizens by city police, that the replacement of the defendant Police Commissioner by a new official did not affect the vitality of the dispute. As one considers the features of the Texas selection system described above, Judge Soboloff's words in *Lankford* are apt:

Our concern is not with the person who happens to hold the office at a particular time, but with the office. The named defendant is only a nominal party, and the real aim of the proceeding is not to reach the Commissioner individually but to forbid an evil practice that

B.   In their next attack on the existence of a live case or controversy, appellees argue that the dispute was mooted by the 1979 amendments to the Texas selection system.  Insofar as they are relevant here, those amendments, passed while these appeals were pending, give the state district judge the option of using either the old key man system or a new random selection system, *see* Tex.Crim.Proc.Code Ann. Art. 19.-01 (Vernon Supp.1980),[31] and provide that, in the event that the key man system is utilized, "the commissioners shall, to the extent possible, select grand jurors who [*sic*] the commissioners determine represent a broad cross-section of the population of the county, considering the factors of race, sex, and age."  *See*  Tex.Crim.Proc.Code Ann. Art. 19.06 (Vernon Supp.1980).[32]

■  These amendments do not, on their face, moot these actions.  The amendment to Article 19.06, in fact, is without effect on them.  Its requirement that the grand jury list reflect a broad cross-section of the community does no more than mirror the constitutional requirements for the composition of grand juries, as discussed below.[33]  The complaints allege that defendants have violated these constitutional requirements; we cannot conclude that the simple incorporation of these standards into state law will end the practices of which appellants complain.

Further, the creation of an option, vested in the state district judge, to use a random selection system in lieu of the key man system does not on its face moot this action.  First, the amendment does not require that the random selection system be used.  The state district judge remains free to continue to use the key man system, and, under the allegations of the complaints, the threat of injury persists as long as that system is used.  In those cases in which a statutory

amendment has been held to moot a controversy arising under the prior version of the statute, the amendment has generally been one which completely eliminated the harm of which plaintiffs complained.  *See, e. g., Kremens v. Bartley*, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1978); *International Society for Krishna Consciousness v. Eaves*, 601 F:2d 809, 815–16 (5th Cir. 1979).[34]  Nor do the records in these cases contain any allegations by appellees or other Hidalgo and Willacy County officials that they intend to switch to the random selection system.  At this stage of the litigation, therefore, we must conclude that the controversy persists.

■  Should appellees wish to present evidence at the trial of these cases that use of the key man system has been abandoned, they will be free to do so, and, if they succeed in establishing its abandonment, that may be an end to these cases to the satisfaction of all the parties.  We note, however, that even this voluntary cessation of the complained-of practices would not necessarily moot the controversy.  As Judge Tuttle has recently written for the ninth circuit,

There is a long-standing rule of equity that a case does not become moot as to the specific petitioner in a case, even if the complained-of conduct has ceased, "if there is a possibility of a recurrence which would be within the terms of a proper decree."  See Bator, Mishkin, Shapiro and Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 110 (1973).  As stated in *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), an antitrust case in which the defendant had voluntarily ceased the allegedly illegal conduct:

---

has long and notoriously persisted in the Police Department.
*Id.* at 205 n. 9.

**31.**  This article, as amended, is reprinted in notes 3 & 4 *supra.*

**32.**  This article, as amended, is reprinted in note 5 *supra.*

**33.**  *See* pp. 825–826 *infra.*

**34.**  Thus, in *Kremens, supra,* the statutory amendments "completely repealed and replaced the statutes challenged below . . ." *Id.* 97 S.Ct. at 1715.

Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot. . . . A controversy may remain to be settled in such circumstances . . .. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion . . . For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right . . .. The courts have rightfully refused to grant defendants such a powerful weapon against public law enforcement. [Citations omitted.]

*Id.* at 632, 73 S.Ct. at 897.

*Lyons v. City of Los Angeles*, 615 F.2d 1243, 1248 (9th Cir. 1980). *See, e. g., Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *NLRB v. Raytheon Co.*, 90 S.Ct. 1547 (1970); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944).

■ Nevertheless, the action may be moot under *W. T. Grant, supra,* "if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one." 73 S.Ct. at 897 (footnote omitted). We thus caution the district court that it must carefully assess the *bona fides* of any claimed total (no less will do) abandonment of the key man system in Hidalgo and Willacy Counties. Appellees cannot be allowed to avoid suit by a mere temporary change of practice, after which they would be "free to return to [their] old ways." *Id.*[35]

C. Appellees' last contention that no justiciable case or controversy exists is that it will be impossible for the district court to formulate a remedy, even if appellants' claim of discrimination is proven. While the court below accepted this argument and we recognize that the formulation of an effective remedy may not be an easy matter, this argument seriously underestimates both the equitable powers and duties and the creative imagination of federal district judges in remedying proven constitutional violations.

■ We note first the requirements placed upon the states by the fourteenth amendment in their selection of grand jurors. In one of the early cases considering the functioning of the Texas system, Justice Black wrote:

It is part of the established tradition in the use of juries as instruments of public justice *that the jury be a body truly representative of the community.* For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.

*Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940) (emphasis added).[36] As this court has made clear, the Constitution permits neither tokenism nor strict proportionalism but requires rather that the grand jurors be chosen from a "fair cross section" of those eligible for grand jury service, and that, to the extent the state relies on the key man system for grand juror selection, "to attain that cross section, jury selectors must become acquainted with

35. If the district court determines that the Willacy County case should continue even if Willacy County has shifted to the random selection option, it should allow the appellants the opportunity to amend their complaint to name as defendant the state district judge for their county since in that circumstance there may be no one holding the office of jury commissioner. Both actions may thus proceed against the state district judges alone; any relief ordered, *see* Part II(C) *infra,* may run against the state district judges, who in turn may be directed to order the jury commissioners to implement it in the event that the judges return to the key man system.

36. While most of the early jury discrimination cases involved discrimination on racial grounds, the courts have also recognized that discrimination against other identifiable groups violates the fourteenth amendment. See pp. 816–819 *supra.*

[the] community's human resources, which is to say, significant elements . . . of that community." *See Brooks, supra,* 366 F.2d at 14. In a similar vein, the Supreme Court has recently emphasized that the Constitution is violated not only by the absolute exclusion of an identifiable group, but also by the substantial underrepresentation of such a group, if that result is intentional. *See Castaneda, supra,* 97 S.Ct. at 1279. From the perspective of potential grand jurors, these requirements translate into a simple rule: the selection system must ensure them equal consideration for grand jury service, without regard to their membership in any identifiable group. *See Carter, supra,* 90 S.Ct. at 523.

■ When a violation of these constitutional mandates is proven, the federal courts have not merely the power, but also the duty, to remedy it. This obligation is not one easily to be denigrated. Certainly the restructuring of the operation of a state institution may be a difficult—even demanding—duty, but it is not a task with which the federal courts are unfamiliar. In keeping with the principle that, when violations of the equal protection component of the fourteenth amendment are proven, the federal courts have " 'not merely the power but the duty to render a decree which will *so far as possible* eliminate the discriminatory effects of the past as well as bar like discrimination in the future,' " *Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 529, 24 L.Ed.2d 549 (1970) (emphasis added), *quoting Louisiana v. United States,* 380 U.S. 145, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965), the federal courts have undertaken the task of ensuring that state schools, *see, e. g., Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); prisons, *see, e. g., Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); voter registration procedures, *see, e. g., Louisiana v. United States,* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); and even grand jury selection processes, *see, e. g., Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); *Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), are operated in consonance with constitutional principles. Indeed, the Supreme Court has given strong utterance to the scope of the federal courts' equitable powers in the face of proven discrimination in grand juror selection:

> The federal courts are not incompetent to fashion detailed and stringent injunctive relief that will remedy any discriminatory application of the statute at the hands of the officials empowered to administer it.

*Carter, supra,* 90 S.Ct. at 527.[37]

■ Against the backdrop of these principles, we consider the district court's conclusion that it could not fashion effective relief to bring the operation of the Texas grand juror selection system within constitutional parameters. The district court recognized that the courts had sanctioned equitable relief in similar cases brought in Alabama and Georgia,[38] but found those cases of "limited value" for its assessment of the

---

**37.** Justice Brennan described the duty and power of the federal courts to remedy state-imposed segregation of its schools in the following terms:

> A judicial decree to accomplish this result must be formulated with great sensitivity to the practicalities of the situation, without ever losing sight of the paramount importance of the constitutional rights being enforced. The District Court must be mindful not only of its "authority to grant appropriate relief," . . . but also of its duty to remedy fully those constitutional violations it finds. It should be flexible but unflinching in its use of its equitable powers . . . .

*Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 2777, 53 L.Ed.2d 851 (1977) (concurring opinion).

**38.** The district court cited as examples of such cases in Alabama, *Carter, supra; Black v. Curb,* 464 F.2d 165 (5th Cir. 1972); *Preston v. Mandeville,* 428 F.2d 1392 (5th Cir. 1970); *Salary v. Wilson,* 415 F.2d 467 (5th Cir. 1969); and *Billingsley v. Clayton,* 359 F.2d 13 (5th Cir. 1966) (*en banc*), *cert. denied,* 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74 (1967); and, in Georgia, *Thompson v. Sheppard,* 490 F.2d 830 (5th Cir. 1974), *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975); and *Pullum v. Greene,* 396 F.2d 251 (5th Cir. 1968). *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), also arose in Georgia.

task of remedying the discriminatory application of the Texas statutes. It emphasized that in the Alabama and Georgia selection schemes, the jury commissioners were required to compile a master list of qualified potential jurors from which a venire was randomly chosen. Discrimination in the compilation of a master list could relatively easily be remedied by an order to compile a new list by non-discriminatory means. The district court emphasized that in Texas, on the other hand, the jury commissioners were required merely to select a group of twenty persons to be summoned as potential grand jurors. Because the Texas statute left the method for choosing this small group to the jury commissioners' discretion and because the Supreme Court had upheld the facial validity of the Texas system, the district court believed it could not interfere with the subjectivity of the choices made by the jury commissioners. Thus, it considered only one mode of relief—an injunction that stated " 'do not discriminate by excluding a certain class' "—and found that such an injunction was not a viable remedy. Whether or not the court's conclusion regarding the viability of such relief alone was correct—a point upon which we express no opinion—we find that it was error to dismiss the complaint for the reasons given in both these cases.

■ First of all, it is generally error in cases like these to order dismissal on the pleadings because the court could not from the outset define an appropriate remedy. As we have pointed out, the Texas statutes do not structure the process by which the jury commissioners select the jury list which forms the basis for selection of the panel. Appellants allege that the system has operated and continues to operate systematically to exclude or underrepresent several identifiable elements in Hidalgo and Willacy Counties. It is possible that, at trial, it will be established that certain pro-

cedures adopted and used consistently by the jury commissioners were responsible for that result. Certainly the district court would then be able to enjoin these practices. In cases in which it appears that an unconstitutional result has consistently been produced by the operation of a state institution and it is not immediately apparent *how* that result has come about, a court has at a minimum an obligation to conduct an inquiry into how the system actually operates before concluding that the system is not amenable to equitable relief. Anything less is an abdication of the court's duty to remedy proven discrimination " 'so far as possible.' " *Carter, supra*, 90 S.Ct. at 529. Moreover, as the seventh circuit has stated,

> Difficulty of formulating a remedy if a complaint is proved following a trial cannot be grounds for dismissing the complaint *ab initio*. We cannot so easily belittle the powers of a court of equity nor the ability of district judges who have grappled with difficult remedies before, *e. g.*, school desegregation orders, railroad reorganizations.

*Littleton v. Berbling*, 468 F.2d 389, 415 (7th Cir. 1972), *rev'd on other grounds sub nom. O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Thus, in this case, it was error for the district court to dismiss these cases on the pleadings.[39]

It is likely that this error arose from the district court's failure to examine the problem of remedy in these cases within the framework established by the Supreme Court for devising remedies for constitutional violations by the states. In *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the Supreme Court reviewed and outlined its three basic principles. It held, first, that the nature of the remedy is

> to be determined by the nature and scope of the constitutional violation. *Swann v. Charlotte-Mecklenburg Board of Educa-*

---

**39.** The Supreme Court has pointed out on several occasions that, while the Texas statutes are constitutional on their face, the great discretion left to the jury commissioners renders them "susceptible to abuse as applied." *Castaneda, supra*, 97 S.Ct. at 1281. *See Hernan-*

*dez, supra*, 74 S.Ct. at 671. It would be ironic in the extreme if this same potential for subjectivity which creates opportunities for constitutional violations would also insulate the system from equitable relief.

*tion, supra,* 402 U.S. [1], at 16, 91 S.Ct. [1267], at 1276, [28 L.Ed.2d 554], The remedy must therefore be related to "the condition alleged to offend the Constitution. . . ." *Milliken I, supra,* 418 U.S. [717], at 738, 94 S.Ct. [3112], at 3124, [41 L.Ed.2d 1069]. Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.,* at 746, 94 S.Ct., at 3128. Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. In *Brown II [Brown v. Board of Education of Topeka, Kansas],* the Court squarely held that "[s]chool authorities have the *primary* responsibility for elucidating, assessing, and solving these problems. . . ." 349 U.S. [294], at 299, 75 S.Ct. [753], at 756, 99 L.Ed. 1083 (Emphasis supplied.) If, however, "school authorities fail in their affirmative obligations . . . judicial authority may be invoked." *Swann, supra,* 402 U.S., at 15, 91 S.Ct., at 1276. Once invoked, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."

*Id.* at 2757 (footnotes omitted).[40] Under these principles, it is again apparent that the question of the nature of the remedy required is generally not to be addressed until the nature and scope of the constitutional violation is established and it is further established exactly what relief is necessary to place the subjects of the state's discriminatory practices in the position they would occupy absent such practices.

The third principle, that the interests of state and local authorities in managing their own affairs should be taken into account by the federal district court in formulating its decree, provides the district court a clue to an effective way of formulating relief in cases such as these. It may prove desirable, if appellants prove their claims of discrimination at trial, to order the jury commissioners themselves to devise a plan to bring the operation of the selection system within constitutional parameters.[41] This course of action appears particularly appropriate in these cases, since the Texas statutes leave such wide discretion to the jury commissioners in their selection of the grand jury list.[42] It appears to be within their discretion, for example, themselves to institute a random method of selection of potential grand jurors from a representative list, such as perhaps the county's voter registration lists.[43] In the case of a particu-

**40.** Although the Supreme Court phrased these principles in terms of the school desegregation remedy which was before it, it indicated that the desegregation remedy was in principle "like other equitable remedies." *Id.* In *Berry v. Cooper,* 577 F.2d 322, 323 n. 3 (5th Cir. 1978), this court recognized the applicability of the *Milliken* principles to the civil action before it, which involved a claim of jury discrimination.

**41.** This procedure has, of course, been applied regularly in formulating school desegregation orders. *See generally Milliken, supra.* Furthermore, the court may require those bringing suit to submit counterproposals and/or to critique the plans submitted by the jury commissioners. In any case the district court has final authority for instituting a decree. A similar procedure to that outlined here was followed by the district court in the *Milliken* proceedings, *see id.,* 97 S.Ct. at 2752–55, and it was the remedy devised through this method that the Supreme Court reviewed.

Once a plan is approved by the district court, subsequent sets of jury commissioners could simply abide by it and avoid further involvement with the federal courts. Should they decide that they are dissatisfied with the plan, however, any proposed changes should be submitted to the district court, and the procedures outlined above repeated.

**42.** By these means the discretion allowed the jury commissioners may be utilized to aid in the remediation of the abuses it has fostered.

**43.** Any list which forms the basis for a selection system like that suggested here must itself be shown to represent the constitutional "fair cross section" of the community. *See Brooks, supra,* 366 F.2d at 23. As the Supreme Court stated in *Carter, supra,* "Our duty to protect federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-

lar grand jury, after selecting in this manner a sufficient number of potential grand jurors, the jury commissioners might apply the statutory qualifications, if indeed they are required to do so.[44] The district court might then require that they file reports revealing how their basic source was compiled, how and why certain individuals were removed from the randomly selected list, and so forth.

Certainly other types of plans might be devised by the jury commissioners, and we by no means imply that the one described above must be adopted. Indeed, this court has held that, given the peculiarities of the Texas selection system, it is not impermissible purposefully to include members of identifiable groups which have previously been unconstitutionally excluded in order to ensure a "fair cross section" in the composition of the grand jury. *See Brooks, supra.*[45] In fact, the jury commissioners have the benefit of guidance from a number of federal court decisions discussing what may, or

may not, constitutionally be done within the confines of the Texas system.[46]

■ In sum, the district court erred in dismissing the complaints because it thought it could not formulate an effective remedy.[47] Not only was dismissal on the pleadings in these cases an inappropriate response to its fears regarding its ability to devise an effective injunction, but, if discrimination is proven, it appears quite clearly that by ordering the jury commissioners to formulate a plan, the court can devise a remedy in keeping with its constitutional duties and limitations. Moreover, it must be kept in mind that if a plan is required and the jury commissioners fail in their affirmative duty to devise an adequate plan to remedy any proven violations, the court may itself exercise its broad equitable powers to formulate effective relief. *See Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522 (1978); *Milliken, supra,* 97 S.Ct. at 2757; *Carter, supra,* 90 S.Ct. at 529 n. 46.[48] The equitable powers of the federal

---

section of the population suitable in character and intelligence for that civic duty." *Id.,* 90 S.Ct. at 525, *quoting Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953).

**44.** See note 8 *supra.*

Judge Brown has suggested that, in a system like that outlined above, much constitutional difficulty may be avoided if the jury commissioners delay exclusions on the basis of subjective statutory qualifications until after a group of potential jurors has been selected from the basic list. *See Broadway v. Culpepper,* 439 F.2d 1253, 1259 n. 19 (5th Cir. 1971).

**45.** Judge Wisdom, who concurred in the result of *Brooks,* did so only because, as he viewed the operation of the Texas scheme, "the jury commissioners had no alternative. They could provide representative grand juries only by intentionally including Negroes." 366 F.2d at 29 n. 7. As we have indicated, we think there may be other ways to remedy the Texas scheme if any violations are proven. Nevertheless, *Brooks* clearly indicates the latitude left to the jury commissioners and the court in devising a remedy.

We add one final cautionary note regarding the purposeful inclusion of previously excluded groups. As the court stated in *Brooks,*

[T]his must never, simply never, be done as the means of discrimination. It must never, simply never, be applied to secure proportional representation. It must never, simply

never, be applied to secure a predetermined or fixed limitation.

*Id.* at 24.

**46.** *See, e. g.,* cases listed at p. 810 *supra.* Of particular relevance is Judge Brown's extensive discussion in *Brooks, supra,* 366 F.2d at 22–24.

**47.** As we have indicated, appellants in both cases sought declaratory as well as injunctive relief from the district court. That court gave no additional reasons for its dismissal of the claims for declaratory relief. Since we hold that, if appellants prove their cases, injunctive relief is appropriate, it follows that declaratory relief may also be granted. *See generally Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

**48.** In *Carter,* the Court noted with approval the decree entered by then District Judge Johnson in *Mitchell v. Johnson,* 250 F.Supp. 117, 123–124 (M.D.Ala.1966), that, after instructing that the old jury roll was to be abandoned and a new one compiled in a non-discretionary manner, provided:

"Failure on the part of defendants to comply immediately and in good faith with the requirements of this opinion and order will necessitate the appointment by this Court of a master or panel of masters to recompile the jury roll and to empty and refill the * * * jury box." (Footnotes omitted.)

*Carter, supra,* 90 S.Ct. at 529 n. 46.

courts are ample to remedy any constitutional violations proven in the trial of these cases.[49]

## IV.

In these cases we have merely resolved the parties' preliminary skirmishings, and, from appellees' side, have detected more smoke than fire. The battle lines now etched, however, we withdraw from the field and leave the parties to mount their attacks and counterattacks in the trial courts. In doing so, we must note that appellees have in their possession a new weapon capable of resolving or perhaps even averting the conflict: the authorization to utilize a random selection system. While utilization of this system would not necessarily end the controversy, see pp. 824–825 supra, it may well provide a key to the settlement of these cases, a veritable truce flag. As the Supreme Court noted in Castaneda, supra, use of a random selection system "would probably avoid most of the potential for abuse found in the key-man system." See id., 97 S.Ct. at 1281 n. 18.

For the reasons given in this opinion, the judgments of the district court are REVERSED and the cases are REMANDED, and appellants' motions for substitution of parties and for judicial notice are also REMANDED to the district court.

REVERSED and REMANDED.

---

**49.** Appellees have also argued here that principles of equitable restraint, based on notions of federalism and comity and derived from cases such as Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); and Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), make it inappropriate for the federal courts to order injunctive relief in these cases. This contention fails for several reasons. First, Younger, O'Shea and Juidice held that federal intervention was inappropriate because there it would interfere with pending judicial proceedings in the state courts. In these cases, the relief is directed to a time prior to the initiation of any actual judicial proceedings; appellants' compliance with the district court's order can be fully accomplished and evaluated before any actual proceedings are commenced—before even the grand jury's consideration of any indictments. These cases are thus outside the equitable restraint principle. See Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 860 n. 9, 43 L.Ed.2d 54 (1975). Second, the decision in Carter v. Jury Commission, supra, indicates that no such obstacle to federal injunctive relief

exists. The Court succinctly and definitively rejected the notion that there were any barriers to injunctive relief in a civil suit such as that before it. See id., 90 S.Ct. at 523–24. As we have shown, the relief sought in Carter was not significantly different from that which may be required here. Finally, in Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), in which the Supreme Court disputed vigorously the availability of federal habeas corpus relief from grand jury discrimination and in which the majority concluded that this relief was not inconsistent with our notions of federalism, see id. at 3003, the Justices on both sides of the question agreed that relief from grand jury discrimination could be obtained by means of civil suits like the two we consider here. See id. at 3001 (majority opinion); id. at 3009 (Stewart, J., concurring the judgment); id. at 3014 (Powell, J., concurring in the judgment). In view of the fact that these opinions were all concerned with the cost of considering grand jury discrimination on federal habeas review, and that these opinions all view civil suits as a more appropriate and less intrusive remedy, it is not a little ironic that the state officials now argue that these same civil actions are barred by principles of federalism and comity.