IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 90-8660

———————————

SOCIETY OF SEPARATIONISTS, INC.,

Plaintiffs-Appellants,

versus

GUY HERMAN, Judge of the Travis
County Court at Law, ET AL.,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————
(April 17, 1992)

Before POLITZ, Chief Judge, GOLDBERG, KING, GARWOOD, JOLLY,
HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE,
E. GARZA, and DeMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    Robin Murray-O'Hair and the Society of Separationists
alleged that a state judge excluded O'Hair from a venire and held
her in contempt because she refused on religious grounds either
to swear or to affirm to answer voir dire questions truthfully.
They sought damages as well as declaratory and injunctive relief
for violating their rights under the Free Exercise Clause of the
First Amendment.  The district court granted defendants' motion
for summary judgment, and a divided panel of this court agreed
that immunity barred an award of damages.  The panel granted a
declaratory judgment, however, which dictated how state judges

should handle a prospective juror's refusal to swear or affirm in the future.  We granted rehearing en banc and, without reaching the underlying merits, conclude that plaintiffs lack standing to seek a prospective remedy.

                                I.

O'Hair is an atheist and a member of the Society of Separationists, a national atheist organization dedicated to the separation of church and state.  In December of 1987, she was summoned and appeared for jury duty in Travis County, Texas.  A deputy court clerk told the prospective jurors to rise and take the oath which Texas requires before voir dire questioning.  O'Hair objected to taking an oath, explaining that she was an atheist and could not participate in such religious exercises.  Judge Guy Herman called her to the bench and told her that in lieu of an oath, she could affirm that she would answer the voir dire questions truthfully.  She stated that she also considered an affirmation religious and therefore could not affirm.  Judge Herman told her to be seated while the other jurors were sworn in.  He then directed her to his regular courtroom for a full hearing.

At this hearing, O'Hair was accompanied by her attorney. The judge said that he respected O'Hair's constitutional right to freedom of religion and therefore would "offer an affirmation without any recognition or any statement, any reference to God or anything of that nature."  O'Hair again refused, repeating her belief that an affirmation was just as religious as an oath.  The

                                2

judge then explained that O'Hair could be held in civil contempt if she refused and that he was not asking her to take an oath and swear to God as to her qualifications for jury service. He was only asking her to affirm that she would give true answers to whatever questions were propounded to her. O'Hair replied that an affirmation was in her understanding a religious statement. No specific form of affirmation was tendered by Judge Herman. The judge did not ask O'Hair what form of assurance of truthfulness would meet her objections, and O'Hair offered none. When she continued to refuse to affirm, Judge Herman found her in civil contempt. She was jailed and released on bond approximately six hours later. O'Hair filed a petition in Travis County district court for a writ of habeas corpus, which was rendered moot when Judge Herman commuted her contempt sentence to the six hours served.

O'Hair and the Society of Separationists then sued Judge Herman, Travis County Judge Bill Aleshire, Travis County, the "Travis County court system," and the clerk, sheriff, and court bailiffs of Travis County in federal district court. They asked the court, inter alia, to "declare the juror oath practice as engaged in by defendants (a judicial coercion of a religious exercise) to be unconstitutional under the First Amendment" and to "grant injunctive relief, both temporary and permanent, against the continuation of such unconstitutional jury oath practices by judges and other public officials." They also

sought $2 million in actual damages and $3 million in punitive damages.[1]

The district court granted defendants' motion for summary judgment. A divided panel of this court affirmed in part, reasoning that all of the defendants other than Judge Herman were either immune, were nonexistent entities, or were otherwise improperly named. They found Judge Herman immune from suit for damages, but recognized that judicial immunity did not bar prospective equitable relief. They concluded that the judge erred in debating the correctness of O'Hair's religious beliefs rather than asking her what sort of pledge she could make to commit herself to tell the truth. Although they found injunctive relief unnecessary, they issued a declaratory judgment requiring judges to ask prospective jurors who object to the oath or affirmation requirement what form of serious public commitment would accord with their constitutionally protected beliefs.

II.

Article III of the Constitution confines the federal courts to deciding actual cases and controversies. Allen v. Wright, 104 S. Ct. 3315, 3324 (1984). The rule that litigants must have standing to invoke the power of the federal courts is perhaps the most important doctrine stemming from the case or controversy requirement. Id. Standing defies precise definition, but at

---

[1] Appended to the complaint was the affidavit of one other atheist who had been excused from jury service by Judge Herman because he refused to affirm. This individual was not held in contempt or jailed, however.

4

the least insists that the complained of injury be real and immediate rather than conjectural, that the injury be traceable to the defendant's allegedly unlawful conduct, and that relief from the injury must be likely to follow from a favorable ruling. Id.

In City of Los Angeles v. Lyons, 103 S. Ct. 1660 (1983), the Supreme Court made clear that plaintiffs may lack standing to seek prospective relief even though they have standing to sue for damages. Lyons was a Los Angeles area resident who was subjected to a chokehold by city police officers when he was stopped for a traffic violation. He obtained a preliminary injunction which prohibited the police department from using the chokehold unless death or serious bodily injury were threatened. The Court reversed. It observed that "'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" Lyons, 103 S. Ct. at 1665 (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)). To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. Lyons lacked standing to obtain an injunction because it was entirely speculative that police officers would stop him again and choke him without provocation. Similar reasoning has been applied to suits for declaratory judgments. Ashcroft v. Mattis, 431 U.S. 171 (1977); Golden v. Zwickler, 394 U.S. 103 (1969).

O'Hair lacks standing to obtain prospective relief for the same reason that Lyons did.  She suffers no continuing harm as a result of Judge Herman's actions.  Nor can she show a real and immediate threat that she will again appear before Judge Herman as a prospective juror and that Judge Herman will again exclude her from jury service and jail her for contempt.  There are over half a million residents in Travis county and twenty trial judges.  The chance that O'Hair will be selected again for jury service and that Judge Herman will be assigned again to oversee her selection as a juror is slim.  Judge Herman's regular duties do not include such matters.  Even if O'Hair were likely to appear before Judge Herman in the future, there is little indication that they would interact in the same fashion.  It is clear that the judge was not acting pursuant to any state or local rule or statute, or even some personal policy, when he failed to ask O'Hair if there were alternative ways in which she would be willing to commit herself to tell the truth.[2]  Nor is there any reason to believe that O'Hair was acting on religious scruples in failing to propose such an alternative.  Whatever the abstract merit of O'Hair's complaint, it springs from a lack of

---

[2]    The Texas laws requiring oaths or affirmations have been narrowed by the Texas courts to mean that such oaths are to be administered in the manner most binding on the individual conscience.  Madeley v. Kern, 488 F.2d 865 (5th Cir. 1984); Craig v. State, 480 S.W.2d 680 (Tex.Cr. App. 1972).  See also Tex. Const. Art. 1 § 5; Vaughn v. State, 177 S.W.2d 59 (Tex. Crim. App. 1944).  These authorities establish what is really undisputed between the parties, namely that, apart from recognition that it is being made subject to the pains and penalties of perjury, Texas law does not require any particular form of words for an oath or affirmation.

6

communication between judge and prospective juror that is inherently contextual and episodic.

This court and others have often held that plaintiffs lack standing to seek prospective relief against judges because the likelihood of future encounters is speculative. In Adams v. McIlhany, 764 F.2d 294, 299 (5th Cir. 1985), a Texas judge held a woman in contempt and jailed her because she had impugned his integrity in a letter. We found the judge immune from suit for damages and held that no case or controversy existed with respect to declaratory or injunctive relief. We explained that it was most unlikely that the plaintiff would again come into conflict with the judge in similar circumstances, and with the same results. In Schepp v. Fremont County, 900 F.2d 1448, 1452-53 (10th Cir. 1990), the Tenth Circuit confronted a § 1983 suit against a state judge who revoked plaintiff's probation. The court held that the judge was immune from suit for damages and that there was no actual controversy warranting the issuance of declaratory relief. The probability that plaintiff would ever again be subject to probation revocation proceedings before this judge was extremely remote. Similar cases are legion. See e.g., Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011, 1019-20 (D.C. Cir. 1991); Johnson v. Moore, 948 F.2d 517, 521-22 (9th Cir. 1991); Foster v. Basham, 932 F.2d 732 (8th Cir. 1991); Northern Virginia Women's Medical Center v. Balch, 617 F.2d 1045, 1048-49 (9th Cir. 1980); see also Brown v. Edwards, 721 F.2d 1442, 1446-47 (5th Cir. 1984).

We must not shrink from our duty to decide a controversy, but that duty includes faithful obedience to the limits of our mandate. It is beyond our mandate to issue prospective relief every time a state actor arguably infringes a constitutional right. As the Supreme Court said in Lyons, "[i]n exercising their equitable powers federal courts must recognize 'the special delicacy of the adjustment to be preserved between federal power and State administration of its own law." 103 S. Ct. at 1670. Principles of comity and federalism, in addition to Article III's jurisdictional bar, mandate that we intervene in the management of state courts only in the extraordinary case. Id.; Pulliam v. Allen, 104 S. Ct. 1970, 1979 (1984).

The Court has been reluctant to superintend state judges in the past. In O'Shea v. Littleton, 414 U.S. 488 (1974), nineteen black residents of Cairo, Illinois requested an injunction against a state judge and magistrate who they alleged had intentionally discriminated against them in setting bond and sentencing. The Court held that the complaint failed to allege a case or controversy. It refused to assume that plaintiffs would violate the law, be charged, tried, and subjected to discrimination by defendants. It emphasized that the requested injunction "would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity." 414 U.S. at 501.

Even if we were inclined to fan cold embers for the heat of a present case or controversy, we would be loath to award

8

declaratory relief on the facts of this case.  The Court has observed on more than one occasion that "[t]he Declaratory Judgment Act was an authorization, not a command."  Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 112 (1962); Eccles v. Peoples Bank, 333 U.S. 426, 431 (1948).  "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative."  Eccles, 333 U.S. at 431.  There is nothing to indicate, and we decline to presume, that Judge Herman will fail to take cognizance of applicable constitutional principles in future proceedings.  Cf. Hamill v. Wright, 870 F.2d 1032, 1035-36 (5th Cir. 1989).

There is, of course, a practical effect of the panel's decision.  Issuing a declaratory judgment would support an award of attorney's fees against Judge Herman under § 1988.  This is an "end run" around a defendant's immunity.  It is appropriate that we recognize that reality in determining whether declaratory relief is warranted.  See Green v. Mansour, 106 S. Ct. 423, 428 (1985); Hewitt v. Helms, 107 S. Ct. 2672, 2677 (1987).  We should be hesitant to inhibit state judges from exercising the discretion that comes with their job by imposing costs solely to protect against a hypothetical risk of future harm.  The practical concerns, combined with concerns of equity, comity, and federalism, tip the balance decisively in favor of restraint.

9

In finding that O'Hair lacks standing to obtain prospective relief, we need not embrace or disturb our decision in O'Hair v. White, 675 F.2d 680 (5th Cir. 1982) (en banc). There we found that Madalyn Murray O'Hair had standing to assert that § 4 of the Texas Constitution excluded her from jury service because of her lack of religious belief. A state law that on its face arguably excluded atheists from serving on juries clearly presented an ongoing threat to Madalyn O'Hair's right not to be excluded from jury service on religious grounds. Likewise courts have held that members of racial minorities have standing to obtain prospective relief from jury selection systems that are consistently administered so as to exclude them from jury service. See, e.g., Carter v. Jury Commission of Greene County, 396 U.S. 320 (1970) (blacks had standing to obtain injunction when statistics clearly indicated that blacks were being systematically excluded in jury selection process); Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners, 622 F.2d 807 (5th Cir. 1980) (Mexican-Americans had standing to obtain prospective relief when jury commissioners systematically excluded them from grand jury service over a ten year period).

This case is of an entirely different stripe. O'Hair challenges no Texas law or policy. The state of Texas was not even named as a defendant. O'Hair makes no showing that Judge Herman or other judges in Travis County or elsewhere in Texas deliberately apply the oath or affirmation requirement so as to exclude atheists. Instead, she objects to the specific events

10

which led to her incarceration by a single judge whom she is unlikely to encounter again and whose administration of the oath or affirmation requirement is likely to vary in different circumstances.

The Supreme Court recently alluded to a similar situation in Powers v. Ohio, 111 S. Ct. 1364, 1373 (1991). In holding that a defendant has standing to object to race-based exclusions of jurors through peremptory challenges, the Court noted the barriers to such suits by an excluded juror. It explained that "[u]nlike a challenge to systematic practices of the jury clerk and commissioners such as we considered in Carter, it would be difficult for an individual juror to show a likelihood that discrimination at the voir dire stage will recur." Id. at 1373 (citing Lyons). Absent evidence of some systematic practice, an excluded juror generally lacks standing to seek prospective relief, since the juror's repeated contacts are with the system itself and not any individual players within it.

The presence of the Society of Separationists in this suit does not alter our conclusion. "An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Comm'n, 432

U.S. 333, 343 (1977).  The Society fails the first and the third requirements of the Hunt test.

First, it has failed to show that its members would otherwise have standing to sue in their own right.  Other Society members are not aggrieved by Judge Herman's exclusion of O'Hair from a venire.  The fact that they may share O'Hair's views of the oath or affirmation requirement is an insufficient predicate for the conclusion that they themselves are facing injury.  Warth v. Seldin, 422 U.S. 490, 502 (1975).  We cannot exercise jurisdiction merely because O'Hair and the Society purport to represent "all individuals eligible for jury service who have deep-seated convictions against mouthing any religious dogma as a condition to jury service."  See Plaintiff's Complaint at 1.  In Golden v. Zwickler, supra, the Court rejected the argument that Zwickler had a right to "a general adjudication of unconstitutionality in his own interest as well as that of others who would with like anonymity practice free speech in a political environment."  394 U.S. at 110.  Constitutional questions must be presented in the context of specific live grievances.  Id.  There is no live grievance here.

Second, it appears likely that the Society's claim would require the participation of individual members.  It is often difficult for religious organizations to assert free exercise claims on behalf of their members because the religious beliefs and practices of the membership differ. See Harris v. McRae, 100

12

S.Ct. 2671, 2690 (1980).[3]  Nothing in this record supports the notion that Society members share O'Hair's views regarding the religious nature of an affirmance.  Speculation that this is so would be perverse indeed in a free exercise case.  This is a fact intensive case--an episodic exchange between a single venire person and a state trial judge.

This case differs from those in which the Court has found that the presence of a class generates a continuing controversy even though the claim of the named plaintiff has become moot. See e.g., County of Riverside v. McLaughlin, 111 S.Ct. 1661 (1991); United States Parole Comm'n v. Geraghty, 445 U.S. 388 (1980); Sosna v. Iowa, 419 U.S. 393 (1975).  Here, there is neither a certifiable class of similarly situated individuals nor a real and immediate threat to such a class.  Even if there were, they would have to demonstrate that a case or controversy existed at the time the complaint was filed.  Riverside, 111 S.Ct. at 1667.  O'Hair and the Society filed their complaint two years after O'Hair's encounter with Judge Herman.  Any controversy had long since subsided.

Neither O'Hair nor the Society has standing to obtain declaratory relief against Judge Herman.  We do not sit to review the actions of state judges in microscopic detail when there is

---

[3]    The Society does not raise a free exercise claim in its own behalf.  When a religious organization itself suffers an actual or threatened injury as a result of defendant's actions, it may have standing in its own right.  See Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696 (1976).

13

no continuing harm and no real threat of repeated injury. Article III "forecloses the conversion of courts of the United States into judicial versions of college debating forums." <u>Valley Forge Christian College v. Americans United for Separation of Church and State</u>, 102 S. Ct. 752, 759 (1982). The panel held that the claim for money damages was barred by judicial immunity. We agree.

Affirmed.

WIENER, concurring in part and dissenting in part:

Judge Goldberg's dissent eloquently and forcefully raises a number of serious problems with the doctrine of standing as currently articulated, and, perhaps more significantly, offers the Supreme Court a principled way to limit the Lyons doctrine so that justice can be done in cases like O'Hair's. Nonetheless, given that the majority, with one minor exception, accurately states and applies the standing doctrine now sanctioned by that Court, I find myself unable to join Judge Goldberg's well-crafted dissent. I therefore concur in the majority's holding that O'Hair does not have standing to procure declaratory relief against Judge Herman under Lyons and its extensive progeny because she cannot show a real and immediate threat that Judge Herman will again exclude her from jury service and jail her for refusing to "affirm." I also concur in the majority's holding that the Society lacks standing to seek prospective relief for its members as it cannot meet the first prong of the test for associational standing set forth in Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).

My disagreement with the majority, and thus my reason for writing separately, stems from the sweeping language, unsupported speculation, and possibly incorrect analysis, that the majority employs in concluding that the Society fails the third prong of the Hunt test. The majority seems to offer two reasons why the Society fails this prong. One is that the Society's members may differ as to the religious nature of an affirmance. If by this statement the majority means to say that the Society lacks standing because its members may have conflicting interests on the outcome of the litigation, then it needlessly decides an issue not previously addressed by this court, and, in so doing, adopts a rule that has been rejected by most circuits that have decided that issue. See National Maritime Union v. Commander, Military Sealift Command, 824 F.2d 1228, 1231-34 (D.C. Cir. 1987) (conflicting interests among members will not defeat union's standing to urge the interests of some members in

litigation); Contractors Ass'n of Eastern Pennsylvania, Inc. v. Philadelphia, 945 F.2d 1260, 1264-66 (3rd Cir. 1991); and Gillis v. U.S. Dept of Health and Human Services, 759 F.2d 565, 572-73 (6th Cir. 1985). But see Associated General Contractors v. Otter Tail Power Co., 611 F.2d 684, 691 (8th Cir. 1979). Indeed, in National Maritime Union, the Circuit Court for the District of Columbia went so far as to assert that the Supreme Court itself, in UAW v. Brock, 477 U.S. 274 (1986), determined that conflicting member interests will not preclude associational standing. 824 F.2d at 1232-33.

The majority's second reason for finding that participation of the individual members of the Society is necessary appears to be that a free exercise claim, by its very nature, requires particularized information from all members. For this proposition the majority cites Harris v. McRae, 448 U.S. 297, 320-21 (1980), in which Justice Stewart, writing for the Court, determined that the Women's Division of the Board of Global Ministries of the United Methodist Church had no standing under the third Hunt prong to challenge the Hyde Amendment on behalf of its members because a free exercise claim "ordinarily requires individual participation." But this court has never interpreted McRae as precluding all free exercise claims brought by associations on behalf of their members. See, e.g., Church of Scientology v. Cazares, 638 F.2d 1272, 1276-80 (5th Cir. 1981) (distinguishing McRae and finding church to have standing under the third Hunt prong to bring a free exercise claim on behalf of its members). The critical aspect of McRae, moreover, was that the Women's Division conceded a diversity of views within its membership as to the permissibility, necessity, and advisability of abortion. In this case, by contrast, the majority presumes a diversity of views, stating that nothing in the record supports the notion that Society members share O'Hair's views regarding the religious nature of an affirmance. Does not the fact that the Society is a co-petitioner in this suit indicate that at least a substantial number of its members hold the same view of an affirmation as does O'Hair?

Furthermore, numerous cases raising issues other than free exercise make clear that the third Hunt prong does not mean that an association lacks standing if the participation of

2

any member is necessary. See, e.g., Hospital Council of Western Pennsylvania v. Pittsburgh, 949 F.2d 83, 89 (3rd Cir. 1991) ("[A]ssociation may assert a claim that requires participation of some members."). The third Hunt prong merely paraphrases the more elaborate discussion of individual participation in Warth v. Seldin, 422 U.S. 490 (1975). In Warth, the Court explained that "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke this court's jurisdiction." 422 U.S. at 511 (emphasis added). In this case, however, it is neither immediately apparent why the individual participation of all Society members would be required for this free exercise claim.

What really disturbs me, no less than it disturbs Judge Goldberg, is that neither O'Hair nor the Society has any way to pursue redress of the First Amendment violations perpetrated by the state trial judge in this case. My disturbance is not, I fear, shared by many of my colleagues, in most of whom I sense a degree of relief that the issue of standing pretermits the need to address Appellees' free exercise claims.

O'Hair, and likely her famous grandmother as well, must have thought that Santa Claus, the Easter bunny, and the tooth fairy had combined their efforts to deliver the jury summons that launched this case on its odyssey. I have the impression that many of my colleagues are thankful to the Supreme Court (if not to that same mythical trio) for providing the insurmountable obstacle of standing that interdicts this court's obligation to deal with the discomfiting First Amendment claims of these perennial Atheist gadflies. In that regard, however, we would all do well to heed the sagacious words of Justice Holmes:

> If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought--not free thought for those who agree with us but freedom for the thought that we hate.

United States v. Schwimmer, 279 U.S. 644, 653 (1929). The practical effect of lack of standing, pursuant to Lyons, is the denial of redress of the type of unconstitutional abuse

3

visited by Judge Herman directly on O'Hair, and indirectly on the Society, as long as occurrences of that nature are anecdotal and do not rise to the frequency or consistency required to confer standing.

True, Judge Herman started down the path of propriety in his handling of O'Hair's free exercise objection to participating in an act of affirmation. In fact, the judge reached the penultimate stepping stone on that path before he deviated from the proper to the impermissible. If, instead of engaging in constitutionally repugnant debate with O'Hair about the validity of <u>her</u> religious beliefs vis-a-vis an affirmation, Judge Herman had calmly but firmly insisted that O'Hair propose a truth-ensuring statement that she felt she could make without violating the tenets of Atheism as she in good faith professes them, the judge would have maintained an unassailable position, doing all that the courts and the Constitution require. That is clear from the panel majority opinion and the dissenting opinion, both penned by Judge Goldberg.

Fortunately, the substance of Judge Goldberg's opinions subsists, shining as a lamp to brighten the constitutional path for the eyes of all trial judges, both state and federal, within the boundaries of this circuit whenever one of those jurists happens to encounter a prospective juror or witness who has either religious or anti-religious concerns about oaths or affirmations. Albeit today's majority opinion keeps Judge Goldberg's opinions from constituting precedent, their lesson is "out there" for all judges of good will to heed.

For the foregoing reasons I specially concur in part and dissent in part.

GOLDBERG, Circuit Judge, dissenting:

4

This has become a case of the tail wagging the dog.

I cannot join the majority opinion because it wags the tail while emaciating the body of the panel opinion. For the reasons expressed in the panel opinion, 939 F.2d 1207 (5th Cir. 1991), I adhere to the view that Judge Herman trespassed upon O'Hair's constitutional right to freedom of religion when he excluded her from jury service and jailed her for refusing to "affirm" without first proposing that she make a non-religious, conscious-binding declaration of a commitment to tell the truth. And because there is not only a likelihood of recurrence, but a statistical certainty that O'Hair and members of the Society of Separationists will again be summoned for jury duty before Judge Herman, I find no jurisdictional impediment to their bringing this lawsuit to challenge Judge Herman's practice.

## I.

The undercurrent of the standing requirement is the notion that courts should only adjudicate those cases in which the plaintiffs have a "`personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." City of Los Angeles v. Lyons, 103 S.Ct. 1660, 1665 (1983) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). The plaintiffs in this "case" have a personal stake in the outcome and the constitutional issues presented are razor sharp: the plaintiffs are atheists who object to the mingling of religion in governmental activities. They brought this lawsuit based upon the practice employed by Judge Herman of the Travis County Court -- on more than one occasion[1] -- requiring that prospective jurors make an "affirmation." Whatever one might think of the constitutionality of Judge Herman's practice, compare Society of Separationists, 939 F.2d at 1215-17 (majority opinion) with id.

---

[1] See infra note 2.

at 1220-24 (Garwood, J., dissenting), no one should doubt that this litigation presents a case and controversy within the meaning of Article III of the Constitution.

A.

The majority's conclusion that the plaintiffs lack standing rests entirely on its application of the Supreme Court's decision in Lyons to the facts of this case. Simply put, Lyons restates the proposition, articulated by the Court in O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974), and Rizzo v. Goode, 423 U.S. 362, 372 (1976), that past exposure to harm will not, in and of itself, confer standing upon a litigant to obtain equitable relief "[a]bsent a sufficient likelihood that he will again by wronged in a similar way...." Lyons, 103 S.Ct. at 1670. The majority reasons that, like the plaintiff in Lyons, O'Hair cannot show a real and immediate threat that she will again be harmed in a similar way. See maj. op. at 6.

Lyons involved a challenge to a chokehold maneuver employed by Los Angeles police officers. The Supreme Court found no standing to obtain prospective relief because the plaintiff, although injured by the chokehold in the past, could not establish a threat of a similar injury in the future. Pivotal to this conclusion was the fact that the plaintiff could not distinguish himself from any other citizen as being a future victim of the unconstitutional act. The past harm suffered by the plaintiff in that case had no bearing on the likelihood that he would again be harmed by the defendant. In other words, the plaintiff in Lyons was no more likely than the next guy to be injured again.

O'Hair and members of the Society of Separationists do not stand in the shoes of the next guy. Indeed, they are susceptible to injury precisely because they are not like the average Joe: they are not willing to conform to the popular view that an affirmation is not a religious exercise. Thus, they are the plaintiffs to bring this action for prospective relief. True, all citizens can expect to be summoned to serve their duty as jurors. But only these plaintiffs,

by virtue of their distinctive views about religious activities, are threatened by Judge Herman's practice. They are uniquely vulnerable to future injury. This is not a case in which "the asserted injury is a generalized grievance shared in substantially equal measure by all or most citizens." O'Hair v. White, 675 F.2d 680, 687 (5th Cir. 1982) (en banc). Such an injury will not suffice to confer standing upon a plaintiff. Id. (citing Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 220 (1974)). Rather, this is a case in which the threatened injury will be suffered by a limited, identifiable group of citizens -- atheists and others whose religious beliefs (or lack of beliefs) cause them to be offended by the demand for an affirmation. See, e.g., Ferguson v. C.I.R., 921 F.2d 588 (5th Cir. 1991) (prospective oath-taker refused to "affirm" because she understood two passages from the Bible to prohibit affirmations).

Although no single plaintiff can predict with certainty when exactly he will be summoned to serve, we can rest assured that these plaintiffs will be summoned in due time, particularly under the random jury selection system. This fact assumes special significance because in Lyons the Court found no standing for the following reason:

> [I]t is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly or serious bodily injury.

Lyons, 103 S.Ct. at 1668. In essence, the plaintiff in Lyons was seeking redress based upon a "chain of speculative contingencies: that he would be arrested and provoke the officer to use the chokehold in an unconstitutional manner." Nelsen v. King County, 895 F.2d 1248, 1252 (9th Cir. 1990) (explaining Lyons).

Unlike Lyons, the threat of future of injury in this case does not depend on a "chain of speculative contingencies," but rather on certain probabilities beyond the plaintiffs' control. We are dealing here with jury duty, an obligation of citizenship. The plaintiffs can reasonably

anticipate similar encounters with Judge Herman in the future when they are summoned to serve as jurors in Travis County. The record reflects that Judge Herman continues to serve on the County Court, and accordingly, there is a quantifiable, mathematical certainty that he will again preside over jury impanelment and encounter O'Hair or some other member the Society of Separationists among the prospective jurors.[2] For some, the fact that the probability is quantifiable, and not "contingency riddled," would independently establish that the likelihood of recurrence is sufficient for standing purposes. "Our analysis cannot be reduced to considering probability merely in terms of quantitative percentages." Nelsen, 895 F.2d at 1250. Perhaps we should also "describe 'probability' [of future injury] qualitatively, as requiring a very significant possibility," id. (quoting Sample v. Johnson, 771 F.2d 1335, 1343 (9th Cir. 1985), cert. denied, 475 U.S. 1019 (1986)), or, as the Supreme Court phrased it in a post-Lyons decision, as requiring a "credible threat" of future injury. Kolender v. Lawson, 103 S.Ct. 1855, 1857 n.3 (1983). Under this qualitative analysis, the plaintiffs have standing because there is a "significant possibility" and "credible threat" that they will be summoned for jury service.

The fact that Judge Herman alone is accountable for the threat of future injury does not take the legs out from under the plaintiffs' position. Although Judge Herman was not

---

[2] The majority's assertion that "Judge Herman's regular duties do not include such matters" as impaneling juries, maj. op. at 6, finds no support in the record. Indeed, there is evidence in the record that not long after he excluded Ms. O'Hair from jury service, Judge Herman was again called upon to impanel a jury. Among the prospective jurors, he encountered an individual who interposed a similar objection to the affirmation process. As with O'Hair, Judge Herman excluded that individual from jury service on that basis. See maj. op. at 4 n.1.

Of course, if there is any question about whether Judge Herman continues to impanel juries, a remand would be appropriate to allow the district court to make factual findings, rather than speculating on appeal as to the likelihood that these plaintiffs will appear before Judge Herman in the future.

"acting pursuant to any state or local rule or statute" when he demanded an affirmation from O'Hair, see maj. op. at 6, there is evidence in the record that he continues to engage in a similar practice: While impaneling a jury following the incident with O'Hair, Judge Herman demanded an "affirmation" from another atheist who was summoned for jury duty and excluded him from service without first proposing that he make a non-religious, conscience-binding declaration as an alternative to an affirmation. See supra note 2. Thus, the record reflects the genesis of a pattern[3] or "personal policy"[4] of exclusion by Judge Herman based on the juror's religious beliefs, which cannot be dismissed as merely "contextual" or "episodic." See maj. op. at 6. We need not wait until Judge Herman excludes or incarcerates others before we can evaluate the constitutionality of Judge Herman's practice and award the appropriate declaratory relief.

B.

The majority's reliance on Lyons and its progeny is misguided for yet another reason. Unlike this case, the plaintiffs' assertion of standing in those cases cited by the majority was predicated upon the contingency that the plaintiff would commit a crime that would set in motion a chain of events culminating in the defendant's unconstitutional act. There was absolutely no measure of certainty that the plaintiffs in those cases would suffer the future injury and the likelihood that they would turned in large part on events within their own control.

---

[3] Cf. Ikuno v. Yip, 912 F.2d 306, 309 (9th Cir. 1990) ("two acts is an accepted minimum" for establishing a "pattern" under the RICO statute) (citing H.J., Inc. v. Northwestern Bell tel. Co., 109 S.Ct. 2893, 2899 (1990)).

[4] Contra maj. op. at 6 ("It is clear that the judge was not acting pursuant to any ... personal policy, when he failed to ask O'Hair if there were alternative ways in which she would be willing to commit herself to tell the truth.").

Our court found no standing in Adams v. McIlhany, 764 F.2d 294, 299 (5th Cir. 1985), cert. denied, 474 U.S. 1101 (1986), because the recurrence depended upon the plaintiff's son committing a crime, being rearrested, charged, and sentenced before the defendant judge in order for the judge to hold the plaintiff in contempt for writing a derogatory letter about the judge. We also found no standing in Brown v. Edwards, 721 F.2d 1442, 1446-47 (5th Cir. 1984), because the plaintiff did not allege or prove that he was "in any way likely, or more likely than any other Mississippian, to be again subjected to arrest or charging by any Mississippi constable." Most recently, this circuit found no standing in Johnson v. Moore, Slip op. 3726, 3729 (5th Cir. Apr. 10, 1992), because "[i]t would require conjecture or hypothesis to find that Johnson [would] again act in such a way as to be arrested on a misdemeanor charge" and thus subject himself to the unconstitutional act of the defendant-judge.

The Tenth Circuit found no standing in Schepp v. Fremont County, 900 F.2d 1448, 1452-53 (10th Cir. 1990), for essentially the same reason: The probability of recurrence was too remote where it depended on the plaintiff violating probation so as to be subjected to probation-revocation proceedings. The Eighth and Ninth Circuits found no standing in cases brought by inmates challenging conditions of confinement in correctional institutions from which they had been transferred because there was no showing that the plaintiffs were likely to return to the institutions. Foster v. Basham, 932 F.2d 732, 734 (8th Cir. 1991); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991).

In Nelsen, another Ninth Circuit case, the court found no standing, recognizing that cases like Lyons and O'Shea turned on the fact that the plaintiff had to commit an unlawful act in order to expose himself to repeated injury. Nelsen, 895 F.2d at 1252. In Nelsen the plaintiffs challenged the constitutionality of the conditions in a drug rehabilitation center where they had been confined. Over a dissent, the panel majority concluded that standing was

lacking because the plaintiffs "failed to demonstrate any ... systematic pattern or policy that would suggest that their return to the [drug rehabilitation] [c]enter [was] inevitable." Id. at 1254.[5]

Even the Supreme Court case underpinning the Lyons decision, O'Shea v. Littleton, 414 U.S. 488 (1974), turned on a "chain of speculative contingencies, particularly a chain that include[d] the violation of an unchallenged law." Nelsen, 895 F.2d at 1252. The Supreme Court found no standing because the plaintiffs would have had to violate the law, be charged and tried before the defendants, in order to be subjected to the unconstitutional conduct. O'Shea, 414 U.S. at 496; see also Ashcroft v. Mattis, 431 U.S. 171, 172 & n.2 (1977) (holding that the plaintiff, whose first son was killed by police while attempting to escape arrest, had no standing to obtain a declaratory judgment on the constitutionality of the state statute authorizing the use of deadly force in apprehending a fleeing felon where complaint merely alleged that plaintiff's other son might be arrested and attempt to flee).

While these cases, relied upon by the majority, distill a principle of black letter law for standing -- that prospective relief is only available if there is a sufficient likelihood of recurrence -- they do not govern this case. Unlike Lyons, O'Shea, Ashcroft, Adams, Brown, Johnson (5th Cir.), Schepp, Foster, Johnson (9th Cir.), and Nelsen,[6] the plaintiffs in this case

_____

[5] The dissenting judge believed that standing did exist because plaintiffs had tendered unrebutted evidence proving that was a 35% to 75% probability that the plaintiffs themselves would return to the facility. The dissent concluded that "appellants have established there is credible threat they will again suffer the harm they have alleged." Id. at 1255 (Pregerson, J., dissenting).

[6] Foster and Johnson (9th Cir.) are different because they involved inmates transferred to different penal institutions, thus mooting out any claim for prospective relief. It appears that there was no threat that they would be transferred back to the original facility. Perhaps if the plaintiffs committed an offense some time later, they might serve time in that institu-

"do not have to induce a police encounter before the possibility of injury can occur. The [plaintiffs] are subject to constitutional injury based on <u>completely innocent behavior</u>...." <u>LaDuke v. Nelson</u>, 762 F.2d 1318, 1326 (9th Cir. 1985) (emphasis added) (holding that the plaintiffs had standing to obtain injunction against the INS for its policy of conducting random searches and seizures of residents of migrant farm dwellings), <u>amended</u>, 796 F.2d 309 (9th Cir. 1986).[7] Rather, the more apposite precedents, are the ones downplayed by the majority: <u>O'Hair v. White</u>, 675 F.2d 680 (5th Cir. 1982) (en banc) and <u>Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Comm'r</u>, 622 F.2d 807 (5th Cir. 1980), <u>cert. denied</u>, 450 U.S. 964 (1981).

In <u>O'Hair v. White</u> this court concluded that the plaintiffs, Madalyn Murray-O'Hair and the Society of Separationists, had standing to challenge a Texas law that infringed upon their right not to be excluded from jury service on religious grounds. The constitutional challenge was virtually identical to the one pressed here. The plaintiffs alleged that law required that they acknowledge the existence of a supreme being. Over two dissenting opinions, a majority of the en banc court found that the plaintiffs had standing to bring the lawsuit even though the plaintiffs arguably could not demonstrate a high probability that they would be summoned for, and excluded from, jury duty. The majority wrote:

> O'Hair's final asserted basis for standing is that section 4 [of the Texas Constitution] caused her to be excluded from jury duty because she refused to swear to her belief in a supreme being. ... O'Hair is ... aggrieved by being excluded from jury duty because of her lack of religious belief.... She clearly has standing to challenge that system.

---

tion. Such speculation, of course, cannot establish a "credible threat" of future injury.

[7] Moreover, this case is different because, as one legal scholar has observed, "<u>Lyons</u> must be understood in large part as a decision of substantive law. In particular, the case seems to represent a further extension and reification of the Court's general, sweeping respect and deference for men in uniform that has overridden a wide range of substantive law claims." Laurence H. Tribe, <u>American Constitutional Law</u> 122 (2d ed. 1988).

675 F.2d at 691. Contra id. at 702 (Tjoflat, J., concurring in part and dissenting in part) ("I would hold that O'Hair lacks standing to assert [her] claim [that she is excluded from jury service based on her religious beliefs] because she alleges not that she has been excluded from jury service but only that she would be"); id. at 703 (Reavley, J., dissenting) (embracing Judge Tjoflat's dissent).

In Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners this court held that Mexican-Americans had standing to obtain prospective relief from systematic exclusion from grand jury service. Concluding that "O'Shea [did] not control the disposition of these cases," we explained that:

> Under these allegations, the threat of future injury is palpable. Unlike the contingency riddled complaint in O'Shea, the complainants here claim an injury that turns on a single contingency that the jury commissioners will act exactly as they have for the past ten years ... Unlike O'Shea ... [plaintiffs'] injury here depends solely upon the action of the [defendants].

622 F.2d at 820-21; see also Carter v. Jury Commission of Greene County, 90 S.Ct. 518, 523 (1970) ("Surely there is no jurisdictional or procedural bar to an attack upon systematic jury discrimination by way of a civil suit such as the one brought here.").

Both O'Hair v. White and Ciudadanos compel a conclusion that the plaintiffs in this case have standing.[8] O'Hair and members of the Society of Separationists are just as threatened by exclusion from jury service as the plaintiffs in those cases. The majority's effort to distinguish those cases as involving either a "state law that on its face arguably excluded atheists from serving on juries" or "jury selection systems that [were] consistently

---

[8] Lyons represented an application, not an extension, of O'Shea. Lyons, 103 S.Ct. at 1667 ("No extension of O'Shea ... is necessary to hold that respondent Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought."). Thus, Ciudadanos and O'Hair v. White, both of which found that the plaintiffs had standing, were not undercut by the Supreme Court's subsequent decision in Lyons.

administered so as to exclude [minorities] from jury service" is unpersuasive. <u>See</u> maj. op. at 10. Standing to obtain equitable relief in <u>any</u> case depends on the threat of future injury -- in this case, as in <u>O'Hair v. White</u>, the threat that the plaintiffs will be excluded from jury service because of their views on religion. In <u>O'Hair v. White</u> and <u>Ciudadanos</u> this court was necessarily satisfied that this threat of future was sufficient to establish the plaintiffs' standing to seek prospective relief. Surely the threat of future injury to any one plaintiff in <u>O'Hair v. White</u> and <u>Ciudadanos</u> was no more "credible," "distinct," "palpable," "real," or "immediate" than the threat of future injury plaguing the plaintiffs in this case. O'Hair and other members of the Society of Separationists have standing to obtain equitable relief.[9]

## II.

From this conclusion, it follows that the Society of Separationists itself has the requisite "associational standing" to bring this lawsuit. <u>See</u> maj. op. at 11 (applying the three prong test articulated in <u>Hunt v. Washington State Apple Advertising Comm'n</u>, 432 U.S. 333, 343 (1977)). I need not comment at length to make this point. I have explained why I believe that O'Hair and other members of the association have demonstrated a sufficient threat of future injury to establish that they have standing in their own right to challenge Judge Herman's practice.[10] That satisfies the first prong of the <u>Hunt</u> test. The majority does not

---

[9] The majority's citation (maj. op. at 11) to <u>Powers v. Ohio</u>, 111 S.Ct. 1364, 1373 (1991), is misplaced. The <u>Powers</u> Court merely observed that a juror could not "easily obtain declaratory or injunctive relief when discrimination occurs through an individual prosecutor's exercise of peremptory challenges." Such would be the case because the use of a peremptory strike depends so much on the subject matter of the underlying prosecution. The threat of future injury would be particularly remote and turn on a "chain of speculative contingencies."

[10] Because the Society represents the interests of similarly situated plaintiffs, it would be fitting, in my view, to aggregate the probabilities of future injury to determine whether the Society has standing to bring suit on behalf of its members. <u>Contrast</u> <u>Asarco Inc. v. Kadish</u>, 109 S.Ct. 2037, 2044 (1989) ("[T]he doctrine of standing to sue is not a kind of gaming

dispute that the "interests [that the Society of Separationists] seeks to protect are germane to the organization's purpose." Hunt, 432 U.S. at 343. So much for the second prong.

As for the third prong, the majority suggests that "the Society's claim would require the participation of individual members ... [because] Society members' views [may] differ as to the religious nature of an affirmance." Maj op. at 12. Even if that bit of speculation were accurate -- that members of the Society take differing positions on affirmations -- associational standing does not require harmony of member interests. See Contractors Ass'n. v. Philadelphia, 945 F.2d 1260, 1266 (3d Cir. 1991) (finding litigation not contrary to interests of a majority of members); National Maritime Union v. Commander, Military Sealift Command, 824 F.2d 1228, 1231-34 (D.C. Cir. 1987); Gillis v. U.S. Dept. of Health & Human Servs., 759 F.2d 565, 572-73 (6th Cir. 1985). Contra Associated Gen. Contractors v. Otter Tail Power Co., 611 F.2d 684, 691 (8th Cir. 1979) (rejecting associational standing when factual or potential conflicts exist among members). See generally UAW v. Brock, 106 S.Ct. 2523, 2532-33 (1986) (declining to "reject the principles of associational standing," notwithstanding argument that associations "will not always be able to represent adequately the interests of their injured members.").

---

device that can be surmounted merely by aggregating the allega-
tions of different kinds of plaintiffs, each of whom may have
claims that are remote or speculative taken by themselves."). By
this I mean that under the first prong of Hunt -- which asks
whether the association's "members would otherwise have standing
to sue in their own right," 432 U.S. at 343 -- the likelihood of
future injury should be measured by the probability that any one
member of the associational plaintiff would be injured, rather
than the probability that a particular member of the association-
al plaintiff might be injured. I believe that aggregating the
probabilities is appropriate in a case like this one, which does
not involve a generalized grievance and implicates both Lyons and
Hunt, because it more accurately reflects the reality, immediacy,
and palpability of the threatened injury to the associational
plaintiff and its membership.

It is also quite plain that in this challenge to Judge Herman's practice of demanding an affirmation as a condition of jury service, the individual plaintiffs are not "indispensable to proper resolution of the cause...." Warth v. Seldin, 422 U.S. 490, 511 (1975). The plaintiffs merely seek a declaration that Judge Herman may not exclude or incarcerate a prospective juror for refusing to affirm until he has proposed that the prospective juror make a nonreligious, conscience-binding declaration of a commitment to tell the truth. "[T]he claim asserted and the relief requested affect the membership as a whole" and therefore, "the claim does not require individualized participation." Church of Scientology v. Cazares, 638 F.2d 1272, 1276-80 (5th Cir. 1981) (association had standing to bring free exercise challenge on behalf of its members)

At least twice since Hunt, this court has held that the Society had standing to raise constitutional claims on behalf of its members. See O'Hair v. White, 675 F.2d at 691-92 (holding that the Society satisfied the requirements of Hunt and thus had standing to litigate alleged violations of its members voting rights); Murray v. City of Austin, 947 F.2d 147, 152 (5th Cir. 1991) ("because Murray has standing, the Society, of which he is a member, also has standing" to litigate the constitutionality of the inclusion of a religious symbol in a city insignia). As in those two cases, I would find that the three-prong Hunt test poses no obstacle to the Society's associational standing in this case.

### III.

This is a case about the First Amendment, the cornerstone of all other rights and freedoms which we, as citizens of this great Nation, have come to enjoy, and perhaps even take for granted. It is very disturbing to think that we would contort the doctrine of standing and employ it as an evasive device for dodging sensitive constitutional questions, especially when First Amendment rights are at stake. Accord maj. op. at 7 ("We must not shrink from

our duty to decide a controversy...."). Not surprisingly, courts have consistently applied the standing doctrine liberally, not grudgingly, in the context of First Amendment litigation.[11]

Standing is not a static concept. Rather, it is an evolutionary doctrine that continues to mature. Although the doctrine appropriately restricts the flood of noxious litigation, we must insure that it does not narrow the avenue for raising concrete constitutional claims. I cannot believe that the Framers would say that a federal court lacks jurisdiction to hear a case brought by a citizen who has been jailed for her refusal to participate in a religious exercise in connection with the performance of a civic duty when that citizen can expect to be summoned again. This court has historically opened its ears and hearts to the wailing cries of those deprived of treasured rights. I would hold that these plaintiffs have standing to raise their claims, and in so doing, preserve the reputation of this court as an open, not a closed, circuit.

I respectfully, but fervently, dissent.

---

[11] Cf. Grand Rapids School Dist. v. Ball, 473 U.S. 373, 380 n.5 (1985) (citing "the numerous cases in which [the Supreme Court has] adjudicated Establishment Clause challenges by state taxpayers to programs for aiding nonpublic schools"); Flast v. Cohen, 392 U.S. 83 (1968) (Establishment Clause challenge to federal aid-to-education program based upon federal taxpayer standing); Everson v. Board of Education, 330 U.S. 1 (1947) (local taxpayer standing to raise Establishment Clause challenge to school district expenditures); Murray v. City of Austin, 947 F.2d 147, 152 (5th Cir. 1991) (concluding that the Society of Separationists and its member had standing to raise Establishment Clause challenge to inclusion of religious symbol in city insignia); see generally Tribe, supra note 3, at 116 ("The Court has been particularly generous in entertaining challenges under the establishment clause of the first amendment to state or local aid to church-related schools.").