**MISSISSIPPIANS FOR QUALITY LIFE, et al., Plaintiffs,**

v.

**Ray MABUS, et al., Defendants.**

**No. DC91–53–S–O.**

United States District Court,
N.D. Mississippi,
Delta Division.

June 30, 1992.

Peggy M. Coleman, Dennis H. Staffelbach, Tupelo, Miss., for plaintiffs.

Robert Sanders, T. Hunt Cole, Jr., Sp. Asst. Attys. Gen., Jackson, Miss., Shelby Duke Goza, David Calder, Hickman, Rayburn, Goza & Gore, Oxford, Miss., for defendants.

## OPINION

SENTER, Chief Judge.

Currently pending is a motion to dismiss the complaint. The court previously denied plaintiffs' request for a preliminary injunction.

## BACKGROUND

Disappointed by the Mississippi legislature's enactment of a law providing for legal gaming within the state, plaintiffs, who are concerned citizens organized to more effectively oppose legalized gambling, have come to this court seeking relief. Plaintiffs have alleged that the legislation grants to voters who favor legalized gambling greater voting rights than those voters who oppose it. Indeed, plaintiffs insist on characterizing this litigation as a "voting rights" case.[1] Plaintiffs also claim that the act is racially discriminatory and employs the historical badges of slavery. They want a declaration that certain portions relating to notice and implementation are unconstitutional.

In general, fourteen counties adjacent either to the Mississippi River or Gulf of Mexico are allowed the opportunity to vote upon a license application by a business seeking to operate a gambling establishment. Once the business's notice of intent to apply is published in a newspaper, opponents wishing to prevent issuance must circulate and obtain enough signatures on a petition to place the issue on the ballot. Failing to comply with any of these steps means that gambling becomes legal by operation of law. If a referendum is held and gambling is defeated, a license can be applied for one year later and the process begins anew. If legal gaming is approved or in place, it cannot be challenged again. Plaintiffs object to the "limited" notice provisions, "time constraints" in gathering petition signatures, and "the limitation on the effectiveness of a vot[e] to reject gambling in the counties." In addition, they claim the law "singles out the counties that have the highest percentage of the population

---

1. The complaint is brought pursuant to 42 U.S.C. §§ 1981 and 1983, and arises under the Ninth and Fourteenth Amendments of the United States Constitution.

that is black, least educated and most impoverished to bear cruise vessel gambling." However, they readily admit that "had the legislature chosen to legalize gambling in the counties designated by the act [or, for that matter, the entire state], it could have done so...."

To challenge this legislation, plaintiffs attempt to classify themselves (within their membership in the organization) into six groups, according to how the legislative scheme allegedly affects them. Four are taxpayers and voters of counties that adjoin the Mississippi River and in which legalized cruise vessel gambling was approved by vote; one is from a county in which a referendum was not initiated and gambling went into effect by operation of law; two others are from a county in which the referendum process was begun, but, due to the inability to obtain the requisite number of signatures on a petition to place the issue on the ballot, gambling was legalized by operation of law; seven live in counties that have participated in the referendum process and defeated the license application; two reside in counties in which notices of intent to apply for a license have not been filed; and two (among those already listed) are black claiming equal protection violations. Each has the same broad target, though.

The motion to dismiss is aimed at plaintiffs' lack of standing to bring this suit. All parties advise the court that no additional discovery is necessary for this issue to be decided. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975) ("[I]t is within the trial court's power to allow ... the plaintiff to supply ... further particularized allega-

tions of fact deemed supportive of plaintiff's standing.").

## DISCUSSION

The doctrine of standing "remains opaque and does not admit of easy application." *O'Hair v. White,* 675 F.2d 680, 685 (5th Cir.1982). *See also Society of Separationists, Inc. v. Herman,* 959 F.2d 1283, 1285 (5th Cir.1992) ("Standing defies precise definition....").[2] This court has read numerous standing decisions and finds these observations to be true. Yet some resolution must be made under the particular circumstances of the instant case, and, after careful consideration,[3] it appears that several key factors, when specifically applied, weigh against the plaintiffs' ability to have their complaint heard in federal court.

" 'Of course, pleadings must be something more than an ingenious academic exercise in the conceivable.' " *Warth,* 422 U.S. at 509, 95 S.Ct. at 2210 (quoting *United States v. SCRAP,* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)). *See also Valley Forge Christian College,* 454 U.S. at 472, 473, 102 S.Ct. at 758, 759 (standing requirements "tend[ ] to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action"; " 'cases and controversies' language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums"). This court cannot help but conclude that, as sincere and laudable as their

---

**2.** Even the highest court in this country finds itself puzzled by this subject. In *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), it candidly stated:

We need not mince words when we say that the concept of "Art. III standing" has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it, nor when we say that this very fact is probably proof that the concept cannot be reduced to a one-sentence or one-

paragraph definition. But of one thing we may be sure: Those who do not possess Article III standing may not litigate as suitors in the courts of the United States.

*Id.* at 475–76, 102 S.Ct. at 760 (footnote omitted).

**3.** *See Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984) ("Typically, ... the standing inquiry requires careful judicial examination of a complainant's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

efforts may be,[4] this is the method by which plaintiffs have attempted to invoke federal jurisdiction.

"Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, ... it often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (citation omitted). And "[t]he federal courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Valley Forge Christian College*, 454 U.S. at 473, 102 S.Ct. at 759 (citation omitted). Terming the instant action as one involving voting rights (at the same time protesting that the allegations do not concern the ability or wisdom of the state of Mississippi to legalize gambling in all or some of its counties)[5] is of no avail to plaintiffs, for

> [t]he requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process. The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts.

*Id.* at 471, 102 S.Ct. at 758.

Thus,

> [i]n some fashion, every provision of the Constitution was meant to serve the interests of all. Such a generalized interest, however, is too abstract to constitute

a "case or controversy" appropriate for judicial resolution. The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries.

*Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 226–27, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974) (footnote omitted). Furthermore, it is not relevant that as a practical matter judicial review of the legislation may be avoided: "Our system of government leaves many crucial decisions to the political processes. The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Id.* at 227, 94 S.Ct. at 2935 (citation omitted). *See also Warth*, 422 U.S. at 508 n. 18, 95 S.Ct. at 2210 n. 18 ("We also note that zoning laws and their provisions, long considered essential to effective urban planning, are peculiarly within the province of state and local legislative authorities.... [C]itizens dissatisfied with provisions of such laws need not overlook the availability of the normal democratic process."). *Cf. Valley Forge Christian College*, 454 U.S. at 483, 102 S.Ct. at 764 ("[I]ndeed, we see no barrier to the *assertion* of such claims with respect to any constitutional provision. But assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.") (emphasis in original).

Related to the nature of the cause of action is injury, a consideration of as equal

---

4. *See Valley Forge Christian College*, 454 U.S. at 486 n. 21, 102 S.Ct. at 766 n. 21 (quoting *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 225–226, 94 S.Ct. 2925, 2934, 41 L.Ed.2d 706 (1974), which quoted *Doremus v. Board of Education*, 342 U.S. 429, 435, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952): "We have no doubt about the sincerity of respondents' stated objectives and the depth of their commitment to them. But the essence of standing 'is not a question of motivation but of possession of the requisite ... interest that is, or is threatened to be, injured by the unconstitutional conduct."; accompanying text in *Valley Forge Christian College* observes, "but standing is not measured by

the intensity of the litigant's interest or the fervor of his advocacy").

5. In the brief in support of injunctive relief, all plaintiffs stated: "It is well recognized that gambling is an activity that is attendant with various illegal activities. These activities range from tax evasion to loan sharking." When "[l]ooking through forms of words to the substance of their complaint," *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923), the distinction between form and substance is clouded, and labelling plaintiffs as nothing more than "concerned bystanders" is unavoidable.

or greater importance. Standing "at the least insists that the complained of injury be real and immediate rather than conjectural, that the injury be traceable to the defendant's allegedly unlawful conduct, and that relief from the injury must be likely to follow from a favorable ruling." *Society of Separationists, Inc.,* 959 F.2d at 1285. "Abstract injury is not enough." *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners,* 622 F.2d 807, 814 (5th Cir.1980), *cert. denied,* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

In *Schlesinger,* the Supreme Court distinguished other rulings from the facts under review:

> It is one thing for a court to hear an individual's complaint that certain specific government action will cause that person private competitive injury, ... or a complaint that individual enjoyment of certain natural resources has been impaired by such action, ... but it is another matter to allow a citizen to call on the courts to resolve abstract questions. The former provides the setting for a focused consideration of a concrete injury. In the latter, although allegations assert an arguable conflict with some limitation of the Constitution, it can be only a matter of speculation whether the claimed violation has caused concrete injury to the particular complainant.

418 U.S. at 223, 94 S.Ct. at 2933 (citations and footnote omitted). Add to these the limited settings discussed in *Allen v. Wright,* 468 U.S. at 759–66, 104 S.Ct. at 3328–32, and even *O'Hair v. White,* cited by plaintiffs, and it is apparent that all the answers to the questions posed in *Allen* are "yes" as applied to the instant case: "Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?" 468 U.S. at 752, 104 S.Ct. at 3325. *Compare Rhode Island Chapter of the National*

*Women's Political Caucus, Inc. v. Rhode Island Lottery Commission,* 609 F.Supp. 1403 (D.R.I.1985) (organization wanting to conduct raffle denied permit plainly suffered injury) *with Allendale Leasing, Inc. v. Stone,* 614 F.Supp. 1440 (D.R.I.1985), *aff'd,* 788 F.2d 830 (1st Cir.1986) (plaintiffs challenging constitutionality of Rhode Island's bingo statutes and regulations lacked standing on due process claim). This leaves the court without jurisdiction of the "generalized grievances," *see, e.g., Warth,* 422 U.S. at 499, 95 S.Ct. at 2205, and their associated abstract, conjectural, or hypothetical injuries, *see, e.g., Allen,* 468 U.S. at 751, 104 S.Ct. at 3324, which are shared and asserted by both the individual plaintiffs and the organization of which they are members.

An appropriate order shall issue.

### ORDER OF DISMISSAL

Pursuant to an opinion filed contemporaneously herewith, IT IS ORDERED:

That this cause of action is dismissed, with plaintiffs to bear the costs.

SO ORDERED.